# EXHIBIT A-1

A STOCK COMPANY



## EVANSTON INSURANCE COMPANY

10275 West Higgins Road, Suite 750
Rosemont, IL 60018

**INSURANCE POLICY**

**Coverage afforded by this policy is provided by the Company (Insurer) and named in the Declarations.**

In **Witness Whereof**, the company (insurer) has caused this policy to be executed and attested and countersigned by a duly authorized representative of the company (insurer) identified in the Declarations.

**Secretary**

**President**

MJIL 1000 08 10

Page 1 of 1



**MARKEL®**

# EVANSTON INSURANCE COMPANY

## PRIVACY NOTICE

U. S. Consumer Privacy Notice

Rev. 1/1/2020

| FACTS | WHAT DOES MARKEL GROUP OF COMPANIES REFERENCED BELOW (INDIVIDUALLY OR COLLECTIVELY REFERRED TO AS "WE", "US", OR "OUR") DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| Why? | In the course of Our business relationship with you, We collect information about you that is necessary to provide you with Our products and services. We treat this information as confidential and recognize the importance of protecting it. Federal and state law gives you the right to limit some but not all sharing of your personal information. Federal and state law also requires Us to tell you how We collect, share, and protect your personal information. Please read this notice carefully to understand what We do. |
| What? | The types of personal information We collect and share depend on the product or service you have with Us. This information can include:<br><br>• your name, mailing and email address(es), telephone number, date of birth, gender, marital or family status, identification numbers issued by government bodies or agencies (i.e.: Social Security number or FEIN, driver's license or other license number), employment, education, occupation, or assets and income from applications and other forms from you, your employer and others;<br><br>• your policy coverage, claims, premiums, and payment history from your dealings with Us, Our Affiliates, or others;<br><br>• your financial history from other insurance companies, financial organizations, or consumer reporting agencies, including but not limited to payment card numbers, bank account or other financial account numbers and account details, credit history and credit scores, assets and income and other financial information, or your medical history and records.<br><br>Personal information does not include:<br><br>• publicly-available information from government records;<br><br>• de-identified or aggregated consumer information.<br><br>When you are no longer Our customer, We continue to share your information as described in this Notice as required by law. |
| How? | All insurance companies need to share customers' personal information to run their everyday business. In the section below, We list the reasons financial companies can share their customers' personal information; the reasons We choose to share; and whether you can limit this sharing. We restrict access to your personal information to those individuals, such as Our employees and agents, who provide you with insurance products and services. We may disclose your personal information to Our Affiliates and Nonaffiliates (1) to process your transaction with Us, for instance, to determine eligibility for coverage, to process claims, or to prevent fraud, or (2) with your written authorization, or (3) otherwise as permitted by law. We do not disclose any of your personal information, as Our customer or former customer, except as described in this Notice. |

MPIL 1007 01 20

| Reasons We can share your personal information | Do We share? | Can you limit this sharing? |
|---|---|---|
| **For Our everyday business purposes and as required by law –** such as to process your transactions, maintain your account(s), respond to court orders and legal/regulatory investigations, to prevent fraud, or report to credit bureaus | Yes | No |
| **For Our marketing purposes –** to offer Our products and services to you | Yes | No |
| **For Joint Marketing with other financial companies** | Yes | No |
| **For Our Affiliates' everyday business purposes –** information about your transactions and experiences | Yes | No |
| **For Our Affiliates' everyday business purposes –** information about your creditworthiness | No | We don't share |
| **For Our Affiliates to market you** | No | We don't share |
| **For Nonaffiliates to market you** | No | We don't share |
| **Questions?** Call (888) 560-4671 or email privacy@markel.com | | |

| Who We are | |
|---|---|
| **Who is providing this Notice?** | A list of Our companies is located at the end of this Notice. |

| What We do | |
|---|---|
| **How do We protect your personal information?** | We maintain reasonable physical, electronic, and procedural safeguards to protect your personal information and to comply with applicable regulatory standards. For more information, visit www.markel.com/privacy-policy. |
| **How do We collect your personal information?** | We collect your personal information, for example, when you <br> • complete an application or other form for insurance <br> • perform transactions with Us, Our Affiliates, or others <br> • file an insurance claim or provide account information <br> • use your credit or debit card <br> We also collect your personal information from others, such as consumer reporting agencies that provide Us with information such as credit information, driving records, and claim histories. |
| **Why can't you limit all sharing of your personal information?** | Federal law gives you the right to limit only <br> • sharing for Affiliates' everyday business purposes – information about your creditworthiness <br> • Affiliates from using your information to market to you <br> • sharing for Nonaffiliates to market to you <br> State laws and individual companies may give you additional rights to limit sharing. See the Other Important Information section of this Notice for more on your rights under state law. |

| Definitions | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies. |
| | • Our Affiliates include member companies of Markel Group. |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies. |
| | • Nonaffiliates that We can share with can include financial services companies such as insurance agencies or brokers, claims adjusters, reinsurers, and auditors, state insurance officials, law enforcement, and others as permitted by law. |
| **Joint Marketing** | A formal agreement between Nonaffiliated companies that together market financial products or services to you. |
| | • Our Joint Marketing providers can include entities providing a service or product that could allow Us to provide a broader selection of insurance products to you. |

| Other Important Information |
|---|
| **For Residents of AZ, CT, GA, IL, ME, MA, MN, MT, NV, NJ, NC, OH, OR, and VA:** Under state law, under certain circumstances you have the right to access and request correction, amendment or deletion of personal information that We have collected from or about you. To do so, contact your agent, visit www.markel.com/privacy-policy, call (888) 560-4671, or write to Markel Corporation Privacy Office, 4521 Highwoods Parkway, Glen Allen, VA 23060.<br><br>We may charge a reasonable fee to cover the costs of providing this information. We will let you know what actions We take. If you do not agree with Our actions, you may send Us a statement. |
| **For Residents of CA:** You have the right to review, make corrections, or delete your recorded personal information contained in Our files. To do so, contact your agent, visit www.markel.com/privacy-policy, call (888) 560-4671, or write to Markel Corporation Privacy Office, 4521 Highwoods Parkway, Glen Allen, VA 23060. We do not and will not sell your personal information.<br><br>For the categories of personal information We have collected from consumers within the last 12 months, please visit: www.markel.com/privacy-policy. |
| **For Residents of MA and ME:** You may ask, in writing, for specific reason, for an adverse underwriting decision. |
| **Markel Group of Companies Providing This Notice:** City National Insurance Company, Essentia Insurance Company, Evanston Insurance Company, FirstComp Insurance Company, Independent Specialty Insurance Company, National Specialty Insurance Company, Markel Bermuda Limited, Markel American Insurance Company, Markel Global Reinsurance Company, Markel Insurance Company, Markel International Insurance Company Limited, Markel Service, Incorporated, Markel West, Inc. (d/b/a in CA as Markel West Insurance Services), Pinnacle National Insurance Company, State National Insurance Company, Inc., Superior Specialty Insurance Company, SureTec Agency Services, Inc. (d/b/a in CA as SureTec Agency Insurance Services), SureTec Indemnity Company, SureTec Insurance Company, United Specialty Insurance Company, Inc. |



# EVANSTON INSURANCE COMPANY

## U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.



**EVANSTON INSURANCE COMPANY**

## DECLARATIONS – SPECIFIED MEDICAL PROFESSIONS INSURANCE POLICY

**Claims Made:** Under certain Coverage Parts of this policy, the coverage afforded is limited to liability for only those Claims that are first made against the Insured during the Policy Period or the Extended Reporting Period, if exercised, and reported to the Company pursuant to the terms herein. Refer to each Coverage Part's opening page to determine if that Coverage Part is Claims Made.

**Notice:** All Coverage Part of this policy contain provisions that reduce the limits of liability stated in the policy by the costs of legal defense and permit legal defense costs to be applied against the deductible, unless otherwise endorsed. Please read the policy carefully.

POLICY NUMBER: SM937777                     RENEWAL OF POLICY: SM933189

1.  **NAMED INSURED:**        Chai Lifeline Inc. DBA: Camp Simcha

2.  **BUSINESS ADDRESS:**     151 W 30th St
                              New York, NY 10001

3.  **POLICY PERIOD:**        From  10/15/2020 to 10/15/2021
                              12:01 A.M. Standard Time at address of Insured stated above

4.  **PROFESSIONAL SERVICES AND SPECIFIED PRODUCTS, GOODS, OPERATIONS OR PREMISES:**

    A.   Professional Services:        Social Service Agency
    B.   Specified Products, Goods, Operations or Premises:        Not Purchased

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, THE COMPANY AGREES WITH THE NAMED INSURED TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| Producer Number, Name and Address |
| --- |
| 75426<br>Risk Placement Services, Inc.<br>530 Preston Ave. Ste. 205<br>Meriden, CT  06450 |

**5.   COVERAGE SCHEDULE:**

This policy includes only those Coverage Parts designated below by "X" as purchased. If a Coverage Part is not expressly designated as purchased, this policy does not include such Coverage Part.

| Coverage Part | Coverage Part Purchased | Coverage Part Limits of Liability | Coverage Part Deductible | Coverage Part Retroactive Date |
|---|---|---|---|---|
| **A.** Specified Medical Professions Professional Liability Insurance Coverage Part – Claims Made Coverage | Yes __X__ | $1,000,000 Each Claim $3,000,000 Aggregate | $2,500 Each Claim | 07/03/2003 |
| **B.** Specified Medical Professions General Liability Insurance Coverage Part – Claims Made Coverage | Yes ____ No __X__ | $Not Purchased Coverage A. Each Occurrence<br><br>$Not Purchased Damage to Premises - Any One Premises<br><br>$Not Purchased Coverage B. Each Person or Organization<br><br>$Not Purchased Coverage C. Each Injured Person<br><br>$Not Purchased Aggregate - All Coverages | $Not Purchased Coverage A. Each Occurrence<br><br><br><br>$Not Purchased Coverage B. Each Person or Organization | Not Purchased |
| **C.** Specified Medical Professions General Liability Insurance Coverage Part – Occurrence Coverage | Yes ____ No __X__ | $Not Purchased Coverage A. Each Occurrence<br><br>$Not Purchased Damage to Premises - Any One Premises<br><br>$Not Purchased Coverage B. Each Person or Organization<br><br>$Not Purchased Coverage C. Each Injured Person<br><br>$Not Purchased Aggregate - All Coverages | $Not Purchased Coverage A. Each Occurrence<br><br><br><br>$Not Purchased Coverage B. Each Person or Organization | |

**6.   PREMIUM FOR POLICY PERIOD:**

Minimum                                             $ ▮▮▮▮▮
Deposit                                             $ ▮▮▮▮▮

**7.   RATE:**   Flat

**PREMIUM BASE:**   Flat

**8.   PREMIUM FOR EXTENDED REPORTING PERIOD:**  150% for 12 months; 175% for 24 months; or 200% for 36 months

9.    The Insured is not a proprietor, superintendent, executive officer, director, partner, trustee or employee of any hospital, sanitarium, clinic with bed-and-board facilities, laboratory, or any business enterprise not named in Item 1. hereinabove, except as follows:

None

10.    **ENDORSEMENTS ATTACHED AT POLICY INCEPTION:**
See MDIL 1001 08 10 attached.

11.    **NOTICES**:

Notices required to be provided to the Company under this policy shall be by email, fax or mail addressed to:

**CLAIM OR DISCOVERY CLAUSE NOTICES:**

Markel Claims
P.O. Box 2009
Glen Allen, VA 23058-2009
Phone:  800-362-7535 (800) 3MARKEL
Fax:  855-662-7535 (855) 6MARKEL
Email:  newclaims@markel.com

**ALL OTHER NOTICES:**

Markel Northeast Region, a division of Markel Service, Incorporated
310 Highway 35 South
Red Bank, NJ 07701-5921
Telephone: (732) 224-0500
Fax: (866) 730-1027

**These declarations, together with the Common Policy Conditions, Coverage Part(s), any Endorsement(s) and any application(s) complete the above numbered policy.**

| | By: _____ |
| --- | --- |
| 9/30/2020 | AUTHORIZED REPRESENTATIVE |



### Markel's Designed Protection®
### Risk Management Resources Allied Health Care
### (Specified Medical) Professionals,

<u>Welcome</u> to Markel's Designed Protection® leading edge Risk Management Resources.

The following risk management resources are available exclusively to our policyholders at our website <u>www.markelcorp.com/riskmanagement</u> at *no additional cost*.

**HOW TO QUICKLY ACCESS RISK MANAGEMENT RESOURCES:**

<u>Step 1.</u>    Go onto our website, <u>www.markelcorp.com/riskmanagement</u>.

<u>Step 2.</u>    Select the Designed Protection services that apply to your policy, to get to the Login screen.

<u>Step 3.</u>    Review the disclaimer, enter your current policy number and click on the button below to access. Your policy number is SM937777.

If you need technical assistance during the log in process, call (866) 932-2433, x113719.

**Available Risk Management Resource:**

- **Designed Protection® Risk Management Telephone Hotlines for:**

   This confidential telephone hotline is staffed by health care professional defense attorneys that are available to answer general risk management questions.

01/11

**INTERLINE**
**POLICY NUMBER:** SM937777



# EVANSTON INSURANCE COMPANY

## FORMS SCHEDULE

| FORM NUMBER | FORM NAME |
|---|---|
| MJIL 1000 08 10 | Policy Jacket |
| MPIL 1007 01 20 | Privacy Notice |
| MPIL 1083 04 15 | US Treasury Dept's Office Of Foreign Assets Control ("OFAC") Notice |
| MDSM 5013 02 20 | Declarations- Specified Medical Professions Insurance Policy |
| MDIL 1001 08 10 | Forms Schedule |
| MESM 5100 02 20 | Common Policy Conditions |
| MESM 5010 02 20 | Spec Medical Professions Profes Liab Ins Cov Part |
| MEIL 1200 02 20 | Service of Suit |
| MEIL 5200-25% 07 04 | Minimum Earned Premium Endorsement |
| MEIL 5229 09 10 | Longer Duratn Extended Report Period Availability |
| MESM 2034 08 15 | DataBreach Coverage Parts Endorsement |
| MESM 2055 02 13 | Risk Management Services Expense Reimbursement |
| MESM 2057 08 15 | Sexual Acts Liability Endorsement |
| MESM 2083 01 11 | HIPAA - Civil Monetary Penalty Endorsement |
| MESM 2093 01 14 | Crisis Management Emergency Response Exp Reim Cov |
| MESM 2147 05 20 | Changes - Multiple Insureds, Claims And Claimants |
| MIL 1214 09 17 | Trade Or Economic Sanctions |

**MDIL 1001 08 10**



# EVANSTON INSURANCE COMPANY

## COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

Throughout this policy, the term Company refers to the insurance company providing this insurance.

### A. CANCELLATION

This policy may be cancelled by the Named Insured on behalf of all Insureds by mailing to the Company written notice as stated in the Notices item of the Declarations stating when thereafter such cancellation shall be effective. If cancelled by the Named Insured, the Company shall retain the customary short rate proportion of the premium. Payment or tender of unearned premium shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

This policy may be cancelled by the Company by mailing to the Named Insured, at the address stated in the Declarations written notice stating when, not less than thirty (30) days thereafter, such cancellation shall be effective. However, if the Company cancels the policy because the Named Insured has failed to pay a premium or Deductible when due, including premium and deductible(s) due on any other policy(ies) issued by the Company or any of its affiliated companies in an uninterrupted series of policies for which this policy is a renewal or replacement, this policy may be cancelled by the Company by mailing a written notice of cancellation to the Named Insured stating when, not less than ten (10) days thereafter, such cancellation shall be effective. The mailing of notice as aforementioned shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the Policy Period. Such notice shall be conclusive on all Insureds. Delivery of such written notice by the Named Insured or the Company shall be equivalent to mailing. If cancelled by the Company, earned premium shall be computed pro rata. Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.

### B. CHANGE IN CONTROL OF NAMED INSURED

If after the inception date of the policy:

1. The Named Insured is merged into or consolidated with another organization such that it is not the surviving organization, or sells all or substantially all of its assets to another organization or person or group of organizations and/or persons acting in concert;

2. Another organization or person or group of organizations and/or persons acting in concert shall acquire an amount of the voting interest representing more than fifty percent (50%) of the voting rights for the election or appointment of directors or trustees of the Named Insured, or acquires the voting rights of such an amount of such interest; or

3. A receiver, liquidator, conservator, trustee or similar official is appointed with respect to the Named Insured;

no coverage shall be afforded under this policy unless:

a. Written notice of such transaction or event is given to the Company by the Named Insured as soon as practicable, but in no event later than thirty (30) days after such transaction or event, including complete details of the nature of such transaction or event and the other organization, person, group of organizations, persons acting in concert, receiver, liquidator, conservator, trustee and/or similar official appointed with respect to the Named Insured;

b. The Named Insured submits such additional information in connection therewith as the Company may deem necessary;

c. The Company, at its sole discretion, agrees to continue coverage by written endorsement to the policy; and

d. The Named Insured agrees to accept any special terms, conditions, exclusions or additional premium charge as may be required by the Company.

C. **REPRESENTATIONS**

By acceptance of this policy, the Insureds agree as follows:

**1.** That the information and statements contained in the application(s) are the basis of this policy and are to be considered as incorporated into and constituting a part of this policy; and

**2.** That the information and statements contained in the application(s) are their representations, that they shall be deemed material to the acceptance of the risk or hazard assumed by the Company under this policy, and that this policy is issued in reliance upon the truth of such representations.

D. **ENTIRE AGREEMENT**

The Declarations, Common Policy Conditions, Coverage Part(s), the application(s) and any written endorsements attached hereto shall be deemed to be a single unitary contract.

E. **OTHER INSURANCE**

This insurance shall be in excess of the applicable Deductible stated in the Declarations and any other insurance available to the Insured whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as a specific excess insurance over the Limits of Liability provided in this policy.

If any Claim under this policy is also covered by one or more policies issued by the Company or any of its affiliated companies affording coverage to the Named Insured or to any organization or person who controls, is controlled by, or is affiliated by common control with the Named Insured unless such other insurance is written only as specific excess insurance or umbrella insurance over the Limits of Liability provided in this policy, then with respect to such Claim:

**1.** The Limit of Liability available under this policy will be equal to the percentage that this policy's available Limit of Liability bears to the total combined Limits of Liability available under all applicable policies; and

**2.** The total Limit of Liability available for such Claim shall not exceed the greater/est available Limit of Liability remaining on all such policies and its payment shall extinguish the Company's and its affiliated companies' liability on all such policies for such Claim.

F. **CHANGES**

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Company shall not effect a waiver or a change in any part of this policy and shall not estop the Company from asserting any right under the terms of the policy. The terms of this policy shall not be waived or changed, except by written endorsement issued to form a part of this policy, and this policy embodies all agreements existing between the Insureds and the Company or any of its agents relating to this insurance.

G. **ASSIGNMENT OF INTEREST**

Assignment of interest under this policy shall not bind the Company unless its consent is endorsed hereon.

H. **SUBROGATION**

In the event of any payment under this policy, the Company shall be subrogated to the right of recovery of all Insureds to the extent of such payment. The Insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The Insured shall do nothing after the Claim to prejudice such rights.

The Company shall not exercise any such rights against any person or organization included in the definition of Insured. Notwithstanding the foregoing, however, the Company reserves the right to exercise any rights of subrogation against an Insured in respect of any Claim brought about or contributed to by an intentional, willful, dishonest, fraudulent act or omission of such Insured or by an act or omission of such Insured that constitutes a willful violation of any statute or regulation.

Any amount so recovered, whether effected by the Company or by the Insured, shall first be used for the repayment of expenses incurred toward subrogation; second, for any Damages and Claim Expenses payment by the Insured which is in excess of the amount of the Limit of Liability under this policy and which is excess of any amount paid by any insurer under any other policy; third, for any damages and claims expenses payment by any excess insurer on behalf of the Insured; fourth, for any damages and claim expenses payment by any primary insurer on behalf of the Insured; and, last, for repayment of the Insured's Deductible.

**I. ASSISTANCE AND COOPERATION OF THE INSURED**

The Insured shall cooperate with the Company and upon the Company's request, the Insured shall:

1. Submit to examination and interview by a representative of the Company, under oath if required;

2. Attend hearings, depositions and trials;

3. Assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses in the conduct of suits;

4. Give a written statement or statements to the Company's representatives and meet with such representatives for the purpose of determining coverage and investigating and/or defending any Claim; and

5. Provide any information required to comply with federal or state reporting regulations;

All without cost to the Company. The Insured shall further cooperate with the Company and do whatever is necessary to secure and effect any right of indemnity, contribution or apportionment which the Insured may have. The Insured shall not, except at his/her own cost, make any payment, admit any liability, settle any Claims, assume any obligation or incur any expense without the prior written consent of the Company.

**J. FALSE OR FRAUDULENT CLAIMS**

If any Insured shall commit fraud in proffering any Claim, this insurance shall become void as to such Insured from the date such fraudulent Claim is proffered.

**K. PREMIUM AND AUDIT**

Upon expiration of this policy, the Named Insured shall furnish to the Company a statement of the Named Insured's actual total premium base as stated in the Declarations for the Policy Period. The actual earned premium shall be computed thereon at the premium rate stated in the Declarations. If the actual earned premium is more than the deposit premium stated in the Declarations, the Named Insured shall pay the difference to the Company; if less, the Company shall refund the difference to the Named Insured except that the Company shall be entitled to the minimum premium as stated in the Declarations. The Company shall have the right to require of the Named Insured, at any time within the said Policy Period or one year thereafter, a sworn statement of the entire amount (or number) of such premium base during the whole or any specified part of the said period, and the Named Insured shall furnish said statement within ten (10) days after request. The statement referred to shall be subject to verification and audit by a duly authorized representative of the Company, who shall have the right and opportunity to examine the books and records of the Named Insured as respects such premium base, and such examination may be made at any time during the said period and within three (3) years thereafter. The rendering of any estimate or statement or the making of any previous settlement shall not bar the examination herein provided for, nor the Company's right to additional premium.

**L. INSPECTION**

The Company shall be permitted but not obligated to inspect the Insured's operations at any time. Neither the Company's right to make inspections, nor the making thereof, nor any report thereon shall constitute an undertaking on behalf of or for the benefit of the Insured or others, to determine or warrant that such operations are safe or healthful, or are in compliance with any law, rule or regulation.

**M. ACTION AGAINST THE COMPANY**

No action shall lie against the Company unless, as a condition precedent thereto, the Insured shall have fully complied with all of the terms and conditions of this policy, nor until the amount of the Insured's obligation to pay shall have been fully and finally determined either by judgment against the Insured after actual trial or by written agreement of the Insured, the claimant and the Company.

Nothing contained in this policy shall give any person or organization any right to join the Company as a co-defendant in any action against the Insured to determine the Insured's liability. Bankruptcy or insolvency of the Insured or of the Insured's estate shall not relieve the Company of any of its obligations hereunder.

**N. AUTHORIZATION**

By acceptance of this policy, the first person or organization stated in Item 1. of the Declarations shall act on behalf of all Insureds with respect to the giving and receiving of all notices to and from the Company as provided herein: the exercising of the Extended Reporting Period, if available; the cancellation of this policy in whole or part; the payment

of premiums and Deductibles when due; the receiving of any return premiums that may become due under this policy; and the Insureds agree that such person or organization shall act on their behalf.

## O. POLICY EXTENDED REPORTING PERIOD – ALL CLAIMS MADE COVERAGES

The Named Insured's right to exercise the Extended Reporting Period under any Coverage Part shall exist solely if the Named Insured also exercises its right to purchase the Extended Reporting Period under all Coverage Parts that provide coverage on a claims made basis.

## P. TERMS AND CONDITIONS

This policy is comprised of these Common Policy Conditions, the Declarations, various Coverage Parts and endorsements, if applicable, and the application. Although various Coverage Parts may be referenced in this policy, a Coverage Part is included within this policy only if that Coverage Part is stated as being purchased in the Coverage Schedule in Item 5. of the Declarations.

Except for these Common Policy Conditions or unless stated to the contrary in any Coverage Part or endorsement, the terms and conditions of each Coverage Part of this policy apply only to that Coverage Part and shall not apply to any other Coverage Part of this policy. Any defined term referenced in the Common Policy Conditions but defined in a Coverage Part shall, for purposes of coverage under that Coverage Part, have the meaning set forth in that Coverage Part. If any provision in the Common Policy Conditions is inconsistent or in conflict with the terms and conditions of any Coverage Part, the terms and conditions of such Coverage Part shall control for purposes of that Coverage Part.

## Q. SERVICE OF SUIT

Except with respect to any policy issued in any state in which the Company is licensed as an admitted insurer to transact business, it is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Named Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court. Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Secretary, Legal Department, Markel Corporation, 10275 West Higgins Road, Suite 750, Rosemont, Illinois 60018 and that in any suit instituted against the Company upon this policy, the Company will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner, or Director of Insurance or other official specified for that purpose in the statute, or his/her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this policy, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

## R. NUCLEAR ENERGY LIABILITY EXCLUSION (Broad Form)

The insurance does not apply:

1. Under any Liability Coverage, to Bodily Injury or Property Damage:

    a. With respect to which an Insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    b. Resulting from the Hazardous Properties of Nuclear Material and with respect to which **(1)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(2)** the Insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

2. Under any Medical Payments coverage, or any Supplementary Payments provision relating to first aid, to expenses incurred with respect to Bodily Injury resulting from the Hazardous Properties of Nuclear Material and arising out of the operation of a Nuclear Facility by any person or organization.

3. Under any Liability Coverage, to Bodily Injury or Property Damage resulting from Hazardous Properties of Nuclear Material, if:

   a. The Nuclear Material **(1)** is at any Nuclear Facility owned by, or operated by or on behalf of, an Insured or **(2)** has been discharged or dispersed therefrom;

   b. The Nuclear Material is contained in Spent Fuel or Waste at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an Insured; or

   c. The Bodily Injury or Property Damage arises out of the furnishing by an Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any Nuclear Facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion c. applies only to Property Damage to such Nuclear Facility and any property thereat.

4. As used in this exclusion:

   Hazardous Properties includes radioactive, toxic or explosive properties.

   Nuclear Material means Source Material, Special Nuclear Material or By-Product Material.

   Source Material, Special Nuclear Material, and By-Product Material have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

   Spent Fuel means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a Nuclear Reactor.

   Waste means any waste material **(1)** containing By-Product Material other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its Source Material content, and **(2)** resulting from the operation by any person or organization of any Nuclear Facility included under the first two paragraphs of the definition of Nuclear Facility.

   Nuclear Facility means:

   a. Any Nuclear Reactor;

   b. Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing Spent Fuel, or **(3)** handling, processing or packaging Waste;

   c. Any equipment or device used for the processing, fabricating or alloying of Special Nuclear Material if at any time the total amount of such material in the custody of the Insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

   d. Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of Waste;

   And includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

   Nuclear Reactor means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

   Property Damage includes all forms of radioactive contamination of property.

<b>INTERLINE</b>



# EVANSTON INSURANCE COMPANY

## SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART

THIS IS A CLAIMS MADE COVERAGE PART. PLEASE READ IT CAREFULLY.

THE INSURED ........................................................................................................................................2

INSURING AGREEMENT .......................................................................................................................2

DEFINITIONS..........................................................................................................................................3

THE EXCLUSIONS ................................................................................................................................4

TERRITORY............................................................................................................................................6

LIMITS OF LIABILITY ...........................................................................................................................6

DEFENSE AND CLAIM EXPENSES .....................................................................................................7

CLAIMS ..................................................................................................................................................7

EXTENDED REPORTING PERIOD .......................................................................................................8

FILED: NEW YORK COUNTY CLERK 12/02/2024 10:57 AM
NYSCEF DOC. NO. 2

INDEX NO. 161011/2024
RECEIVED NYSCEF: 12/02/2024

Case 1:24-cv-09670-VSB    Document 5-2    Filed 12/19/24    Page 18 of 49

INTERLINE

# SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART

THIS IS A CLAIMS MADE COVERAGE PART. PLEASE READ IT CAREFULLY.

In consideration of the premium paid, the undertaking of the Named Insured to pay the Deductible as described herein and in the amount stated in the Declarations, in reliance upon the statements in the application attached hereto and made a part hereof and the underwriting information submitted on behalf of the Insured, and subject to all the terms, conditions and limitations of this policy, the Company and the Insured agree as follows:

## THE INSURED

The unqualified word "Insured," either in the singular or plural, means:

**A.** The Named Insured which is herein defined as the person(s) or organization(s) stated in Item 1. of the Declarations;

**B.** Any past or current principal, partner, officer, director, Employee or Volunteer Worker of the Named Insured solely while acting on behalf of the Named Insured and within the scope of their duties as such; provided, however, this insurance shall not apply to any Claim made against any Insured who is a physician, surgeon, dentist or podiatrist arising out of the rendering of or failure to render Professional Services in his/her capacity as a physician, surgeon, dentist or podiatrist;

**C.** If the Named Insured is a limited liability company, any past or current manager thereof, solely while acting on behalf of the Named Insured and within the scope of their duties as manager of such limited liability company and any past or current member thereof, solely while acting on behalf of the Named Insured and within the scope of their duties as a member of such limited liability company;

**D.** Any medical director solely while acting on behalf of the Named Insured and solely within the scope of his/her Administrative Duties as such; provided, however, this insurance shall not apply to any Claim made against any medical director who is a physician, surgeon, dentist or podiatrist arising out of the rendering of or failure to render Professional Services in his/her capacity as a physician, surgeon, dentist or podiatrist;

**E.** Any student enrolled in a training program in connection with the Named Insured's Professional Services solely while acting within the scope of his/her duties as such and at the Named Insured's direction;

**F.** The heirs, executors, administrators, assigns and legal representatives of each Insured above in the event of death, incapacity or bankruptcy of such Insured, but only for each such Insured's liability as is otherwise covered herein.

## INSURING AGREEMENT

**A.** **Professional Liability and Claims Made Clause:**  The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount stated in the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of a Claim first made against the Insured during the Policy Period or during the Extended Reporting Period, if exercised, and reported to the Company pursuant to Section CLAIMS A., Claim Reporting Provision, for Professional Personal Injury:

    **1.** By reason of any act, error or omission in Professional Services arising out of the conduct of the Insured's Professional Services rendered or that should have been rendered by an Insured; or

    **2.** By reason of any act, error or omission in Professional Services arising out of the conduct of the Insured's Professional Services rendered or that should have been rendered by a natural person, who is not and shall not be an Insured hereunder, and through whose acts the Insured controls the provider-patient relationship as of the time of such act, error or omission;

    provided:

    **a.** The act, error or omission happens during the Policy Period or on or after the Retroactive Date stated in the Declarations and before the end of the Policy Period; and

    **b.** Prior to the effective date of this policy the Insured had no knowledge of such act, error or omission or any fact, circumstance, situation or incident which may lead a reasonable person in the Insured's position to conclude that a Claim was likely.

## DEFINITIONS

INTERLINE

**A.**   **Administrative Duties** means establishing medical protocol, serving on a standards review, peer review, or credentialing committee or similar professional board or committee of the Named Insured; provided, however, Administrative Duties shall not include:

1. Rendering or failure to render Professional Services by a medical director which results in Professional Personal Injury; or

2. Rendering or failure to render specific medical direction for a natural person receiving Professional Services via telecommunications to other healthcare professionals.

**B.**   **Claim** means the Insured's receipt of:

1. A written demand for Damages or Professional Services; or

2. The service of suit or institution of arbitration proceedings against the Insured seeking Damages.

**C.**   **Claim Expenses** means reasonable and necessary amounts incurred by the Company or by the Insured with the prior written consent of the Company in the defense of that portion of any Claim for which coverage is afforded under this Coverage Part, including costs of investigation, court costs, costs of bonds to release attachments and similar bonds, but without any obligation of the Company to apply for or furnish any such bonds, and costs of appeals; provided, however, Claim Expenses shall not include:

1. Salary, wages, overhead, or benefit expenses of or associated with Employees or officials of the Named Insured or employees or officials of the Company; or

2. Salary, wages, administration, overhead, benefit expenses, or charges of any kind attributable to any in-house counsel or captive out-of-house counsel for the Named Insured or the Company.

**D.**   **Damages** means the monetary portion of any judgment, award or settlement; provided, however, Damages shall not include:

1. Punitive or exemplary damages or multiplied portions of damages in excess of actual damages, including trebling of damages;

2. Taxes, criminal or civil fines, or attorneys' fees of a party other than an Insured or other penalties imposed by law;

3. Sanctions;

4. Matters which are uninsurable under the law pursuant to which this Coverage Part shall be construed;

5. The return, withdrawal, reduction or restitution or payment of fees, profits or charges for services or consideration and/or any expenses paid to the Insured; or

6. The cost of complying with an award or order for declaratory, equitable or injunctive relief or remedy.

**E.**   **Employee** means any natural person while in the regular service of the Named Insured in the ordinary course of the Named Insured's business and whom the Named Insured compensates by salary, wages or commissions and has the right to govern and direct the performance of such service. Employee includes a Leased Worker but does not include any Temporary Worker or independent contractor.

**F.**   **Leased Worker** means any natural person leased to the Named Insured by a labor leasing organization, under an agreement between the Named Insured and the labor leasing organization, to perform duties related to the conduct of the Named Insured's business and which are at the Insured's direction. Leased Worker does not include a Temporary Worker.

**G.**   **Policy Period** means the period form the inception date of this policy to the policy expiration date stated in Item 3. of the Declarations, or the effective date of any earlier cancellation or termination.

**H.**   **Professional Personal Injury** means:

1. Any bodily injury, mental injury, sickness, disease, emotional distress or mental anguish, including death resulting therefrom of any natural person receiving Professional Services arising out of an act, error or omission in Professional Services rendered or that should have been rendered;

2. False arrest, detention or imprisonment, or malicious prosecution of any natural person receiving Professional Services, except when inflicted by, at the direction of, or with the consent or acquiescence of the Insured who has predetermined to commit such act, or allowed such act to have been committed; or

INTERLINE

3. The publication or utterance of a libel or slander concerning a natural person receiving Professional Services or a publication or an utterance in violation of such person's right to professional confidence, except when published or uttered by, at the direction of, or with the consent or acquiescence of the Insured who has predetermined to commit such act, or allowed such act to have been committed.

I. **Professional Services** means those services stated in Item 4. of the Declarations.

J. **Temporary Worker** means any natural person who is furnished to the Named Insured to substitute for a permanent Employee on leave or to meet seasonal or short-term work load requirements.

K. **Volunteer Worker** means any natural person who is not an Employee of the Named Insured and who donates his/her work at the direction of and within the scope of duties determined by the Named Insured and is not paid a fee, salary or other compensation by the Named Insured or by anyone else for such work performed for the Named Insured.

## THE EXCLUSIONS

This Coverage Part does not apply to:

A. Any act, error or omission in Professional Services rendered or that should have been rendered or Professional Personal Injury committed in violation of any law or ordinance;

B. Any Claim based upon or arising out of any dishonest, fraudulent, criminal, malicious, knowingly wrongful, deliberate, or intentional acts, errors or omissions committed by or at the direction of the Insured;

C. Any administrative or judicial hearings pertaining to Medicare/Medicaid fraud or any other hearing initiated against an Insured by the United States Department of Health & Human Services (HHS) or by an utilization or quality review organization under contract with HHS; provided, however, this exclusion shall not apply to HHS proceedings that allege the violation of the Emergency Medical Treatment and Labor Act;

D. Any Claim based upon or arising out of the invasion, infringement or interference of the right of privacy arising from the use, visitation of, posting or browsing of any blog, bulletin board services, chat room, web site or other internet form or URL;

E. Any Claim based upon or arising out of the gathering, use or dissemination of personal information in any form including but not limited to any violation of the Health Insurance Portability and Accountability Act of 1996 (HIPAA);

F. Any Claim based upon or arising out of any unlawful discrimination by any Insured;

G. Any Claim based upon or arising out of any act, error or omission committed or alleged to have been committed by the Insured that in any manner relates to or arises out of the actual, alleged or threatened discharge, dispersal, release, escape or existence of pollutants, hazardous substances, toxic substances or substances which in any manner impair or allegedly impair the environment or which result in bodily injury or property damage;

H. Any liability arising out of the Insured's activities in his/her capacity as proprietor, superintendent, executive officer, director, partner, trustee or employee of any hospital, sanitarium, clinic with bed-and-board facilities, laboratory or business enterprise, or any governmental body, sub-division or agency not named as an Insured under this policy unless such activities are disclosed in the application and covered by endorsement to this policy;

I. Any Claim based upon or arising out of any liability of others assumed by the Insured under any contract or agreement; unless such liability would have attached to the Insured even in the absence of the contract or agreement;

J. Any Claim arising out of general liability, or goods or products manufactured, sold, handled or distributed by the Insured or by others trading under an Insured's name;

K. Any liability arising out of the ownership, maintenance, operation, use, loading or unloading of any vehicle, watercraft or aircraft;

L. Any Claim based upon or arising out of any sexual act, including without limitation sexual intimacy (even if consensual), sexual contact, sexual advances, requests for sexual favors, sexual molestation, sexual assault, sexual abuse, sexual harassment, sexual exploitation or other verbal or physical conduct of a sexual nature; provided, however, the Company agrees to defend the Named Insured for such a Claim for the strictly vicarious liability of the Named Insured, unless a manager, supervisor, officer, director, trustee or partner of the Named Insured:

INTERLINE

1. Knew or should have known about the sexual act allegedly committed by the Insured but failed to prevent or stop it; or

2. Knew or should have known that the Insured who allegedly committed the sexual act had a prior history of such sexual misconduct act;

The Company shall not pay Damages on behalf of the Named Insured for such a Claim.

**M.** Injury arising out of the performance of a criminal act or caused by an Insured while under the influence of intoxicants or narcotics;

**N.** Any Claim based upon, arising out of, or in any way involving:

1. The employment relationship or the nature, terms or conditions of employment or any workplace tort brought by or on behalf of any Employee, former Employee, prospective employee, independent contractor or consultant of the Insured or to Professional Personal Injury to, or sickness, disease or death of any Employee of the Insured arising out of, and in the course of his/her employment by the Insured;

2. Any obligation of the Insured under any workers' compensation, unemployment compensation or disability benefits law or under any similar law; or

3. Any actual or alleged violation of the Employee Retirement Income Security Act of 1974, or any other similar federal, state or common law or any amendments thereto;

**O.** Any Claim based upon or arising out of:

1. The dispensing of or the use of any drug or device whose approval for use was withdrawn by the U.S. Food and Drug Administration (FDA) at the time such drug or device was used or dispensed;

2. Use, administration or prescription of any drug, pharmaceutical, medical device or procedure which has not received final approval by the FDA for treatment of humans or which is not used, administered or prescribed as part of an FDA approved study;

**P.** Any Claim based upon or arising out of a warranty or guarantee of cure or success of treatment which is alleged to have arisen out of an advertisement;

**Q.** Any Claim based upon or arising out of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C., Section 1961, et seq.;

**R.** Any Claim based upon or arising out the disarming or disabling of any alarms or monitoring devices of medical equipment;

**S.** Any Claim based upon or arising out of:

1. The failure to maintain medical records in their original condition;

2. Creating, altering, amending or modifying medical records;

3. Improperly disposing of medical records;

4. The failure to maintain the privacy and security of medical records or private personal information;

**T.** Any Claim made against the Insured:

1. By any person or organization or its subrogee, assignee, contractor, subcontractor, or parent company, subsidiary, division or affiliated company which was or is operated, managed, owned or otherwise controlled, whether directly or indirectly, or in whole or in part, by an Insured or parent company or any subsidiary, division or affiliated organization; or

2. By or on behalf of any Insured under this policy; provided, however, this exclusion shall not apply to any Claim made against any Insured arising out of the rendering of or failure to render Professional Services by the Insured or by any person for whose acts, errors or omissions the Insured is legally responsible, if such Insured is a natural person receiving Professional Services;

**U.** Any Claim based upon or arising out of:

1. Any allegations of price fixing, unfair competition or trade practices;

2. A dispute over fees, income or revenue;

INTERLINE

3.  The inducement to enter into, the interference with or the dissolution or termination of any business or economic relationship; or

4.  Violations of any federal, state or local law (including but not limited to Title 15 of the United States Code or any similar state statute) that prohibits the unlawful restraint of trade, business or profession;

**V.**  Any Claim based upon or arising out of any violation of:

1.  The Telephone Consumer Protection Act of 1991 (TCPA) and amendments thereto or any similar or related federal, state or local statute, law, rule, ordinance or regulation;

2.  The CAN-SPAM Act of 2003 and amendments thereto or any similar or related federal or state statute, law, rule, ordinance or regulation;

3.  The Fair Credit Reporting Act (FCRA) and amendments thereto or any similar or related federal, state or local statute, law, rule, ordinance or regulation, including the Fair and Accurate Credit Transactions Act of 2003 (FACTA); or

4.  Any other statute, law, rule, ordinance or regulation that addresses, prohibits or limits the dissemination, sending, transmitting, communication, printing, disposal, collection, recording or distribution of information or other material;

**W.**  Any Claim based upon or arising out:

1.  Any disciplinary proceeding against the Insured conducted by any regulatory body, disciplinary board or governmental agency; or

2.  Any federal or state inquiry or review involving an Insured's professional licensure; or

**X.**  Any Claim brought under any other Coverage Part of this policy.

## TERRITORY

The insurance afforded applies worldwide, provided the Claim is made in the United States of America, its territories or possessions or Puerto Rico.

## LIMITS OF LIABILITY

**A.**  **Limit of Liability-Each Claim:**  For Professional Liability, the total liability of the Company for the combined total of Damages and Claim Expenses for each Claim first made against the Insured during the Policy Period or the Extended Reporting Period, if exercised, shall not exceed the Limit of Liability stated in the Declarations as applicable to Each Claim.

**B.**  **Limit of Liability-Coverage Part Aggregate:**  Subject to the above Section LIMITS OF LIABILITY A., for Professional Liability, the total liability of the Company shall not exceed the Coverage Part Aggregate Limit of Liability as stated in the Declarations for all Damages and Claim Expenses arising out of all Claims first made against the Insured during the Policy Period and the Extended Reporting Period, if exercised.

**C.**  **Limit of Liability-Reduction for Refusal to Settle:**  The Company shall not settle any Claim without the consent of the Insured. If, however, the Insured is a partnership, professional association, professional corporation or limited liability company, the written consent of an Insured who was formerly but is no longer a member of the partnership, professional association or limited liability company or director, officer, stockholder or employee of a professional corporation will not be required, provided the written consent of the corporate directors, officers, stockholders or employees of a professional corporation, or their duly appointed representatives, has been obtained. If, however, the Insured shall refuse to consent to any settlement recommended by the Company and shall elect to contest the Claim or continue any legal proceedings in connection with such Claim, then the Company's liability for the Claim shall not exceed the amount for which the Claim could have been so settled including Claim Expenses incurred up to the date of such refusal. Such amounts are subject to the provisions of the above Limits of Liability A. and B.

**D.**  **Deductible:**  For Professional Liability, the Deductible amount stated in the Declarations shall be paid by the Named Insured and shall be applicable to each Claim and shall include Damages and Claim Expenses, whether or not Damages payments are made.

Such amounts shall, upon written demand by the Company, be paid by the Named Insured within ten (10) days. The total payments requested from the Named Insured in respect of each Claim shall not exceed the Deductible amount stated in the Declarations.

FILED: NEW YORK COUNTY CLERK 12/02/2024 10:57 AM  INDEX NO. 161011/2024
NYSCEF DOC. NO. 2                                                                    RECEIVED NYSCEF: 12/02/2024

The determination of the Company as to the reasonableness of the Claim Expenses shall be conclusive on the Named Insured.

**E.** **Multiple Insureds, Claims and Claimants:** The inclusion herein of more than one Insured in any Claim or the making of Claims by more than one person or organization shall not operate to increase the Limits of Liability stated in the Declarations. More than one Claim arising out of a single act, error or omission or a series of related acts, errors or omissions shall be considered a single Claim. All such Claims, whenever made, shall be deemed to be first made on the date on which the earliest Claim arising out of such act, error or omission is made, or with regard to written notice given to and accepted by the Company pursuant to Section CLAIMS B., Discovery Clause, on the date within the Policy Period on which such written notice of potential Claim is first received by the Company.

## DEFENSE AND CLAIM EXPENSES

**A.** **Defense and Investigation of Claims:** The Company shall have the right and duty to defend and investigate any Claim to which coverage under this Coverage Part applies pursuant to the following provisions:

1. Claim Expenses incurred in defending and investigating such Claim shall be a part of and shall not be in addition to the Professional Liability Limits of Liability stated in the Declarations. Such Claim Expenses shall reduce the Limits of Liability and shall be applied against the Deductible. The Company shall have no obligation to pay any Damages or to defend or continue to defend any Claim or to pay Claim Expenses after the Professional Liability Limits of Liability stated in the Declarations have been exhausted by payment(s) of Damages and/or Claim Expenses.

2. The Company shall select defense counsel; provided, however, that if the law of the state of the Named Insured's domicile, stated in Item 2. of the Declarations, allows the Insured to control the selection of defense counsel where a conflict of interest has arisen between the Insured and the Company, the Company will provide a list of attorneys or law firms from which the Insured may designate defense counsel who shall act solely in the interest of the Insured, and the Insured shall direct such defense counsel to cooperate with the Company. Such cooperation shall include:

   **a.** Providing on a regular basis, but not less frequently than every three (3) months, written reports on claimed Damages, potential liability, progress of any litigation, any settlement demands, or any investigation developments that materially affect the Claim;

   **b.** Providing any other reasonable information requested;

   **c.** Providing fully itemized billing on a periodic basis; and

   **d.** Cooperating with the Company and the Insured in resolving any discrepancies;

   and the fees and costs incurred by such defense counsel, including those fees and costs generated by defense counsel's cooperation with the Company, as stated above, shall be included in Claim Expenses. Such Claim Expenses shall be a part of and shall not be in addition to the Professional Liability Limits of Liability stated in the Declarations. Such Claim Expenses shall reduce the Limits of Liability and shall be applied against the Deductible.

## CLAIMS

**A.** **Claim Reporting Provision:** It is a condition precedent to coverage afforded by this Coverage Part that the Insured shall give to the Company written notice as stated in the Notices item of the Declarations as soon as practicable of any Claim first made against the Insured during the Policy Period or the Extended Reporting Period, if exercised.

In the event suit is brought against the Insured, the Insured shall immediately forward to Markel Corporation, P.O. Box 2009, Glen Allen, VA 23058-2009, on behalf of the Company, every demand, notice, summons or other process received by him/her or by his/her representatives.

**B.** **Discovery Clause:** If during the Policy Period, the Insured first becomes aware of a specific act, error or omission in Professional Services which is reasonably expected to result in a Claim within the scope of coverage of this Coverage Part, then the Insured may provide written notice as stated in the Declarations to the Company containing the information listed below. If such written notice is received by the Company during the Policy Period, then any Claim subsequently made against the Insured arising out of such act, error or omission in Professional Services shall be deemed for the purpose of this insurance to have been first made on the date on which such written notice is received by the Company.

FILED: NEW YORK COUNTY CLERK 12/02/2024 10:57 AM
NYSCEF DOC. NO. 2

INDEX NO. 161011/2024
RECEIVED NYSCEF: 12/02/2024

Case 1:24-cv-09670-VSB    Document 5-2    Filed 12/19/24    Page 24 of 49

INTERLINE

It is a condition precedent to the coverage afforded by this Discovery Clause that written notice be given to the Company containing the following information:

**1.** The description of the specific act, error or omission in Professional Services;

**2.** The date on which such act, error or omission in Professional Services took place;

**3.** The injury or damage which has or may result from such act, error or omission in Professional Services;

**4.** The identity of any injured persons; and

**5.** The circumstances by which the Insured first became aware of such act, error or omission in Professional Services.

Subject to the paragraph hereinabove, if during the Policy Period the Insured provides such written notice of a specific act, error or omission in Professional Services which is reasonably expected to result in a Claim within the scope of coverage of this Coverage Part, the Company at its sole option, may investigate such specific act, error or omission in Professional Services. Such matter shall be subject to all terms, conditions and provisions in this Coverage Part as applicable to a Claim.

## EXTENDED REPORTING PERIOD

**A.** The Named Insured's right to exercise the Extended Reporting Period under this Coverage Part shall exist solely if the Named Insured also exercises its right to purchase the Extended Reporting Period under all Insuring Agreements in the policy for which an Extended Reporting Period is available.

**B.** If the Named Insured nonrenews this policy in its entirety or cancels this policy in its entirety pursuant to Common Policy Conditions Section A., Cancellation, or if the Company nonrenews this policy in its entirety or cancels this policy in its entirety pursuant to Common Policy Conditions A., Cancellation, for reasons other than nonpayment of premium, Deductible or non-compliance with the terms and conditions of this policy, then the Named Insured shall have the right upon payment of an additional premium calculated at the percentage stated in the Declarations of the adjusted annual premium for the Policy Period, subject to adjustment as per Common Policy Conditions K., Premium and Audit, but in no event less than the percentage stated in the Declarations of the annual minimum premium for the policy, to extend the coverage granted under this Coverage Part, for the period of months stated in the Declarations, as elected by the Named Insured to apply to Claims first made against the Insured during the period of months as elected and reported to the Company pursuant to, Section CLAIMS A., Claim Reporting Provision, following immediately upon the effective date of such cancellation or nonrenewal, for any act, error or omission in Professional Services which happened on or after the applicable Retroactive Date stated in the Declarations and prior to the effective date of such cancellation or nonrenewal and which is otherwise covered by this Coverage Part.

This extended period of coverage months as elected by the Named Insured and described in this paragraph shall be referred to in this policy as the Extended Reporting Period.

If, however, this Coverage Part is immediately succeeded by claims made insurance coverage on which the Professional Liability Retroactive Date is the same as or earlier than that stated in the Declarations of this policy, the succeeding insurance shall be deemed to be a renewal hereof and, in consequence, the Named Insured shall have no right to purchase an Extended Reporting Period.

The quotation of a different premium and/or deductible and/or limit of liability for renewal does not constitute a cancellation or refusal to renew for the purpose of this provision.

This Extended Reporting Period shall not be available when any Insured's license or right to practice his/her profession is revoked, suspended or surrendered.

**C.** As a condition precedent to the right to purchase the Extended Reporting Period, the Named Insured must have paid:

**1.** All Deductibles when due;

**2.** All premiums due for the Policy Period; and

**3.** All premium and deductible(s), if any, due on any other policy(ies) issued by the Company or any of its affiliated companies in an uninterrupted series of policies of which this policy is a renewal or replacement.

The right to purchase the Extended Reporting Period shall terminate unless a written request for the Extended Reporting Period is received by the Company within thirty (30) days after the effective date of cancellation or

**INTERLINE**

nonrenewal together with payment of the additional deposit premium for the Extended Reporting Period. If such written request and payment of additional premium for the Extended Reporting Period are not so received by the Company, there shall be no right to purchase the Extended Reporting Period at a later date.

**D.** The Named Insured shall pay any additional premium that may be due as a result of audit, promptly when due.

**E.** In the event of the purchase of the Extended Reporting Period the entire premium therefor shall be fully earned at its commencement.

**F.** The Extended Reporting Period shall not in any way increase the Limits of Liability stated in the Declarations.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SERVICE OF SUIT

Except with respect to any policy issued in any state in which the Insurer is licensed as an admitted insurer to transact business, it is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Named Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court. Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Secretary, Legal Department, Markel Service, Incorporated, 10275 West Higgins Road, Suite 750, Rosemont, Illinois 60018, and that in any suit instituted against the Company upon this policy, the Company will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance or other official specified for that purpose in the statute, or his/her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this policy, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## MINIMUM EARNED PREMIUM ENDORSEMENT

In the event that this policy is cancelled by the Named Insured who is authorized to act on behalf of all insureds, the policy premium is subject to a minimum earned premium of 25%.

All other terms and conditions remain unchanged.

**MEIL 5200-25% 07 04**

**Page 1 of 1**

POLICY NUMBER: SM937777



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## LONGER DURATION EXTENDED REPORTING PERIOD AVAILABILITY

This endorsement modifies insurance provided under the following:

PHYSICIANS, SURGEONS, DENTISTS AND PODIATRISTS PROFESSIONAL LIABILITY INSURANCE POLICY
SPECIFIED ERRORS AND OMISSIONS LIABILITY INSURANCE COVERAGE PART – CLAIMS MADE
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE POLICY
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE PART - CLAIMS MADE COVERAGE
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART - CLAIMS MADE
    COVERAGE
SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY (INCLUDING PRODUCTS AND COMPLETED
    OPERATIONS LIABILITY) INSURANCE COVERAGE PART - CLAIMS MADE COVERAGE
LOCUM TENENS AND CONTRACT STAFFING PROFESSIONAL LIABILITY INSURANCE COVERAGE PART
LOCUM TENENS AND CONTRACT STAFFING GENERAL LIABILITY INSURANCE (INCLUDING PRODUCTS AND
    COMPLETED OPERATIONS LIABILITY) COVERAGE PART - CLAIMS MADE COVERAGE

In consideration of the premium paid, it is hereby understood and agreed that in addition to the availability of the Extended Reporting Period for the period of months stated in Item 8. of the Declarations, an Extended Reporting Period of the following duration shall also be available:

48 months;
60 months;
72 months; or
84 months.

The Named Insured must make a written request for the longer duration Extended Reporting Period received by the Company within 10 days after the end of the Policy Period. The written request must specify from the options stated above which period of Extended Reporting Period is requested. The Company will determine the additional premium to be charged for such Extended Reporting Period.

The Company will provide to the Named Insured in writing the amount of the additional premium for an Extended Reporting Period of the duration specified within 10 days of receipt of the Named Insured's written request.

All other terms and conditions of the Section Extended Reporting Period shall apply with regard to the Named Insured's exercise of any such longer duration Extended Reporting Period.

All other terms and conditions remain unchanged.

**MEIL 5229 09 10**

**Page 1 of 1**

POLICY NUMBER: SM937777



# EVANSTON INSURANCE COMPANY

## DATABREACH<sup>SM</sup> COVERAGE PARTS ENDORSEMENT

This endorsement adds to the insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART - CLAIMS MADE COVERAGE

In consideration of the premium paid, it is understood and agreed that the coverages afforded by this Endorsement are subject to the terms, conditions and limitations of this policy, except to the extent that such terms, conditions and limitations are modified herein. Solely with respect to the coverages afforded by this Endorsement, the policy is amended as follows:

**Claims Made and Reported Coverage:** With regard to DataBreach<sup>SM</sup> COVERAGE A. - Data Breach and Privacy Liability Coverage Part, the coverage afforded by this Endorsement is limited to liability for only those Claims that are first made against the Insured during the Policy Period or the Extended Reporting Period, if exercised, and reported to the Company during the Policy Period or the Extended Reporting Period, if exercised, or within sixty (60) days after the expiration of the Policy Period or the Extended Reporting Period, if exercised.

**Notice:** DataBreach<sup>SM</sup> COVERAGE A. - Data Breach and Privacy Liability Coverage Part, of this Endorsement contains provisions that reduce the limits of liability stated in the Endorsement by the costs of legal defense.

The limits of liability applicable to the coverage parts provided under this Endorsement are in addition to, and do not erode the limits of liability provided under the Professional Liability coverage afforded in the policy to which this endorsement attaches.

Please read this Endorsement carefully.

1. Section THE INSURED is deleted and replaced with the following:

   **THE INSURED**

   The unqualified word "Insured" wherever used in this endorsement either in the singular or plural, means:

   **A.** The Named Insured herein defined as the person(s) or organization(s) stated in Item 1. of the Declarations.

2. Section INSURING AGREEMENTS is amended by the addition of the following:

   **DataBreach<sup>SM</sup> COVERAGE A. - Data Breach and Privacy Liability Coverage Part – Claims Made and Reported Coverage:**

   The Company shall pay on behalf of the Insured, all sums which the Insured shall become legally obligated to pay as Damages and Regulatory Fines both of which are a result of a Claim first made against the Insured during the Policy Period or the Extended Reporting Period, if exercised, and reported to the Company during the Policy Period or the Extended Reporting Period, if exercised, or within sixty (60) days after the expiration of the Policy Period or Extended Reporting Period, if exercised, by reason of an Unauthorized Access or a Potential Unauthorized Access, provided:

   1. The entirety of the Unauthorized Access or the discovery of the Potential Unauthorized Access happens during the Policy Period or on or after 07/03/2019 and before the end of the Policy Period; and

   2. Prior to the effective date of this policy the Named Insured or any past or current principal, partner, officer, director, trustee, shareholder, Employee, manager or member of the Named Insured had no knowledge of such Unauthorized Access, Potential Unauthorized Access or any computer security incident, intrusion, breach, compromise, theft, loss or use of the Named Insured's Electronic Communications System which may have led a reasonable person in such party's position to conclude that a Claim was likely.

**MESM 2034 08 15**                                                                                                          **Page 1 of 12**

**DataBreach<sup>SM</sup> COVERAGE B. - Data Breach Loss to Insured Coverage Part – Occurrence Coverage:**

The Company shall indemnify the Named Insured for the amount of Loss which results directly from an Unauthorized Access which occurs during the Policy Period and is reported to the Company pursuant to Section CLAIMS, LOSS AND EXPENSES B., provided:

1.  Prior to the effective date of this policy the Named Insured or any past or current principal, partner, officer, director, trustee, shareholder, Employee, manager or member of the Named Insured had no knowledge that such Unauthorized Access had occurred in whole or in part, and if such party knew prior to the Policy Period that the Unauthorized Access had occurred, then any continuation, change or resumption of such Unauthorized Access during or after the Policy Period will be deemed to have been known prior to the Policy Period;

2.  Unauthorized Access, which occurs during the Policy Period and was not, prior to the Policy Period known to have occurred by the Named Insured or any past or current principal, partner, officer, director, trustee, shareholder, Employee, manager or member of the Named Insured, includes any continuation, change or resumption of that Unauthorized Access after the end of the Policy Period; and

3.  Unauthorized Access will be deemed to have been known to have occurred at the earliest of the Named Insured or any past or current principal, partner, officer, director, trustee, shareholder, Employee, manager or member of the Named Insured:

    (a)  Reporting all, or any part, of the Unauthorized Access to the Company, any other insurer or any insurance representative;

    (b)  Incurring Loss or Breach Mitigation Expense because of the Unauthorized Access; or

    (c)  Becoming aware by any other means that Unauthorized Access has occurred or has begun to occur.

**DataBreach<sup>SM</sup> COVERAGE C. - Breach Mitigation Expense Coverage Part – Occurrence Coverage:** The Company shall, subject to the prior written consent of the Company, reimburse the Named Insured for the reasonable cost actually incurred by the Named Insured for Breach Mitigation Expense which results directly from an Unintentional Data Compromise which occurs during the Policy Period and is reported to the Company pursuant to Section CLAIMS, LOSS AND EXPENSES C., provided:

1.  The entirety of the Unintentional Data Compromise occurs during the Policy Period; and

2.  Prior to the effective date of this policy the Named Insured or any past or current principal, partner, officer, director, trustee, shareholder, Employee, manager or member of the Named Insured had no knowledge such Unintentional Data Compromise of:

    a.  The Named Insured's Electronic Communications System; or

    b.  The Electronic Communications System of a third party responsible for storing and securing the data of the Named Insured;

    had occurred in whole or in part, which may have led a reasonable person in such party's position to conclude that incurring such expenses was likely, and if any such party knew prior to the Policy Period that such Unintentional Data Compromise had occurred, then any continuation, change or resumption of such Unintentional Data Compromise during or after the Policy Period will be deemed to have been known prior to the Policy Period; and

3.  Unintentional Data Compromise will be deemed to have been known to have occurred at the earliest of any Insured:

    a.  Reporting all, or any part, of an Unauthorized Access or Potential Unauthorized Access to the Company, any other insurer or any insurance representative;

    b.  Incurring Loss or Breach Mitigation Expense because of an Unauthorized Access or Potential Unauthorized Access; or

    c.  Becoming aware by any other means that an Unintentional Data Compromise has occurred or has begun to occur.

The Named Insured must submit to the Company satisfactory written proof of payment of such costs within one (1) year after the expiration or cancellation of this policy.

If such expenses as are reimbursable under this DataBreach<sup>SM</sup> COVERAGE C. - Breach Mitigation Expense Coverage Part become part of a judgment, award or settlement, such expenses shall not be subject to coverage under DataBreach<sup>SM</sup> COVERAGE C. - Breach Mitigation Expense Coverage Part.

3.   Section DEFINITIONS is deleted and replaced with the following:

**DEFINITIONS**

A.   **Authority** means any agency of:

1.   A federal, state or local government of the United States of America, its territories or possessions or Puerto Rico;

2.   A federal, provincial or local government of Canada;

3.   The government of the European Union (EU) or any member nation; or

4.   The PCI Security Standards Council;

any of which is charged with the administration or enforcement of laws or regulations relating to the use, transfer or storage of electronic communications or data storage systems.

B.   **Bodily Injury** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these; provided, however, Bodily Injury does not include humiliation or the infliction of emotional distress arising solely from an Unauthorized Access or Potential Unauthorized Access.

C.   **Breach Mitigation Expense** means expenses incurred by the Insured with the prior written consent of the Company for:

1.   The services of a public relations professional, or other publicity expenses that are recommended by a public relations professional to respond to any actual adverse publicity in the media, that is the result of an Unauthorized Access or Potential Unauthorized Access;

2.   Expenses, including but not limited to patient notification and related legal fees, that are incurred to comply with a Security Breach Notice Law and that are the result of an Unauthorized Access or Potential Unauthorized Access; and

3.   Expenses associated with voluntarily providing credit monitoring services to patients and individuals effected by an Unauthorized Access or Potential Unauthorized Access.

D.   **Claim** means the Insured's receipt of:

1.   A written demand for damages;

2.   The service of suit or institution of arbitration proceedings against the Insured; or

3.   A written notice of the institution of a charge against the Insured by any Authority or of any administrative proceeding initiated by an Authority including any investigation, conciliation meeting or hearing;

all as a result of an Unauthorized Access or Potential Unauthorized Access.

E.   **Claim Expenses** means reasonable and necessary amounts incurred by the Company, or by the Insured with the prior written consent of the Company, in the defense of that portion of any Claim for which coverage is afforded under this Endorsement, including costs of investigation, court costs, costs of bonds to release attachments and similar bonds, but without any obligation of the Company to apply for or furnish any such bonds, and costs of appeals; provided, however, that Claim Expenses shall not include:

1.   Salary, wages, overhead, or benefit expenses of or associated with Employees or officials of the Named Insured or employees or officials of the Company; or

2.   Salary, wages, administration, overhead, benefit expenses, or charges of any kind attributable to any in-house counsel or captive out-of-house counsel for the Named Insured or the Company.

F.   **Damages** means the monetary portion of any judgment, award or settlement, including punitive damages where insurable; provided, however, Damages shall not include:

1.   Multiplied portions of damages in excess of actual damages, including trebling of damages;

2. The cost of any modifications or changes to the Insured's security measures, procedures, software or hardware required or agreed to by the Insured to satisfy a judgment, award or settlement;

3. Any cost required to repair, build or modify property to comply with any award by a court, administrative order, arbitration award or any similar judgment;

4. Taxes, criminal or civil fines, or attorneys' fees of a party other than an Insured, other penalties imposed by law or Regulatory Fines;

5. Sanctions;

6. Matters which are uninsurable under the law pursuant to which this Endorsement shall be construed; or

7. The return, withdrawal, reduction, restitution or payment of any fees, profits or charges for services or consideration and/or any expenses paid to the Insured.

G. **Electronic Communications System** means any wired, wireless, radio, electromagnetic, photo-optical or photo-electronic facility for the transmission of electronic communications; any electronic data processing system, network or related electronic equipment for the storage of such communications; and any computer.

H. **Employee** means any natural person while in the regular service of the Named Insured in the ordinary course of the Named Insured's business and whom the Named Insured compensates by salary, wages or commissions and has the right to govern and direct the performance of such service. Employee includes a Leased Worker but does not include any Temporary Worker or independent contractor.

I. **Leased Worker** means any natural person leased to the Named Insured by a labor leasing organization, under an agreement between the Named Insured and the labor leasing organization, to perform duties related to the conduct of the Named Insured's business and which are at the Insured's direction. Leased Worker does not include a Temporary Worker.

J. **Forensic Expense** means reasonable and necessary costs incurred by the Named Insured to engage the services of a third party computer security expert to determine the existence and cause of any Unauthorized Access.

K. **Interrelated Unauthorized Accesses** means Unauthorized Access(es) and/or Potential Unauthorized Access(es) which are logically or causally connected by reason of any common fact, incident, circumstance, situation, or any computer security incident, intrusion, breach, compromise, theft, loss or use of the Named Insured's Electronic Communications System.

L. **Loss** means:

1. Reasonable and necessary costs incurred by the Named Insured to restore with due diligence and dispatch the Named Insured's Electronic Communications System to the condition that existed prior to an Unauthorized Access, including reconstruction of programs, electronic data and media which form a part of the Named Insured's Electronic Communications System; and

2. Forensic Expense;

provided, however, Loss shall not include: (a) any cost or charges associated with building, modifying or upgrading the Named Insured's Electronic Communications System, or any software, security measures or procedures; (b) any cost required to repair, build or modify tangible property to comply with any award or order by a court, an Authority, arbitration or any similar proceeding; (c) any loss of reputation of the Named Insured or loss of customer confidence in the Named Insured or the value imputed to such loss; (d) expenses incurred by the Insured in establishing the amount of any Loss covered under this Endorsement; or (e) loss of business income.

M. **Policy Period** means the period stated from the inception date of this policy to the policy expiration date stated in in Item 3. of the Declarations, or the effective date of any earlier cancellation or termination.

N. **Potential Unauthorized Access** means the threat or potential threat of an Unauthorized Access arising from a theft or loss of any component of the Named Insured's Electronic Communications System.

O. **Pollutants** mean any solid, liquid, gaseous, fuel, lubricant, thermal, acoustic, electrical, or magnetic irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, fibers, radiation, acid, alkalis, petroleums, chemicals or waste. Waste includes medical waste and all other materials to be disposed of, recycled, stored, reconditioned or reclaimed.

**P.** **Private Data** means data containing an individual's:

    **1.** Drivers license or other state-issued identification number; social security number; unpublished telephone number; savings account, checking account, credit card or debit card number each when in combination with the security code, access code, password or pin for such account or card number;

    **2.** "Nonpublic personal information" as defined in the Gramm-Leach Bliley Act of 1999, as amended, and regulations issued pursuant thereto;

    **3.** "Protected healthcare information" as defined in the Health Insurance Portability and Accountability Act of 1996 (HIPAA), as amended, and regulations issued pursuant thereto, and medical and healthcare information;

    **4.** Private personal information as defined under a Security Breach Notice Law; and

    **5.** Private personal information as defined under the law of a country other than the United States, which law is intended to provide for the protection of such private personal information;

not including any lawfully available data accessible by the general public.

**Q.** **Property Damage** means physical injury to tangible property, including all resulting loss of use of that property or loss of use of tangible property that is not physically injured; provided, however, damage to, corruption of or inability to access data, software and computer networks shall not be considered to be loss of use of tangible property.

**R.** **Regulatory Fines** means civil fines and penalties assessed against the Insured by an Authority as a result of a Claim subject to coverage under DataBreach$^{SM}$ COVERAGE A. - Data Breach and Privacy Liability Coverage Part of this Endorsement.

**S.** **Security Breach Notice Law** means any law, statute or regulation within the United States of America, its territories or possessions, Puerto Rico or Canada requiring the Named Insured to notify individuals of the compromise or possible compromise of the security of their confidential information in the Named Insured's care, custody or control and the European Union (EU) Data Protection Act of 1995.

**T.** **Temporary Worker** means any natural person who is furnished to the Named Insured to substitute for a permanent Employee on leave or to meet seasonal or short-term work load requirements.

**U.** **Unauthorized Access** means a breach of the Named Insured's security measures, systems, procedures, or stated privacy policy, or any intentional violation, interception, or use or misuse of the Named Insured's Electronic Communications System, whether or not for profit or gain, by any person, without the permission, knowledge or ratification of the Insured. Unauthorized Access also includes:

    **1.** Access to the Named Insured's Electronic Communications System that is with the Insured's permission where such permission is the result of fraud or deception;

    **2.** Use of the Named Insured's Electronic Communications System by a party authorized by the Insured to use such system, who does so for an unauthorized purpose;

    **3.** The introduction of programs into the Named Insured's Electronic Communications System which contain fraudulent or destructive instructions or code including any inadvertent transmission of such programs to a third party;

    **4.** A credible threat or an extortion demand received by the Named Insured threatening or portending loss, injury or damage to:

        **a.** The Named Insured's Electronic Communications System, including programs, electronic data and media which form a part of the Named Insured's Electronic Communications System; or

        **b.** Money, securities, bonds or similar financial instruments, solely to the extent that record of such is maintained in digital or electronic format on the Named Insured's Electronic Communications System;

    for the purpose of extorting money or other valuable consideration from the Named Insured; and

    **5.** Failure to prevent a denial of service attack on the Named Insured's Electronic Communications System or to prevent the use of the Named Insured's Electronic Communications System by an unauthorized user or code to launch a denial of service attack on a third party;

**6.** Solely with regard to:

    **a.** DataBreach<sup>SM</sup> COVERAGE A. - Data Breach and Privacy Liability Coverage Part; and

    **b.** DataBreach<sup>SM</sup> COVERAGE C. - Breach Mitigation Expense Coverage Part;

    the theft or loss of any paper records; and

**7.** Solely with regard to DataBreach<sup>SM</sup> COVERAGE C. - Breach Mitigation Expense Coverage Part:

    The failure of any third party to prevent the unauthorized viewing, copying or distribution of Private Data which the Named Insured has entrusted to such party under a written contract or agreement that specifically requires such party to protect the confidentiality of the Private Data so entrusted.

**V.**   **Unintentional Data Compromise** means any computer security incident, intrusion, breach, compromise, theft, loss or misuse of the Private Data of the Named Insured's patient(s) and/or of any past or current principal, partner, officer, director, trustee, shareholder, Employee, manager or member of the Named Insured.

**W.**   **Volunteer Worker** means any natural person who is not an Employee of the Named Insured and who donates his/her work at the direction of and within the scope of duties determined by the Named Insured and is not paid a fee, salary or other compensation by the Named Insured or by anyone else for such work performed for the Named Insured.

**4.**   Section THE EXCLUSIONS is deleted and replaced with the following:

**THE EXCLUSIONS**

**A.**   With respect to all Coverage Parts provided by this Endorsement, this Endorsement does not apply to any Claim, Loss or Breach Mitigation Expense:

**1.** Caused by access to the Named Insured's Electronic Communications System by any government, governmental agency or subagency, or any agents thereof while acting on behalf of such entity;

**2.** Due to riot, civil commotion, war, insurrection or usurped power;

**3.** Based upon or arising out of Bodily Injury or Property Damage;

**4.** Based upon or arising out of liability of others assumed by the Insured under any contract or agreement; provided, however, this exclusion shall not apply to liability an Insured would have in the absence of such contract or agreement;

**5.** Based upon, arising out of, or any way involving any actual or alleged violation of any law, whether statutory, regulatory or common law, respecting any of the following activities: antitrust, business competition, unfair trade practices or tortious interference in another's business or contractual relationships;

**6.** Based upon, arising out of, or in any way involving conduct of the Insured or at the Insured's direction that is intentional, willful, dishonest, fraudulent or that constitutes a willful violation of any statute or regulation; provided, however, this exclusion shall not apply to: (a) the strictly vicarious liability of any Insured for the intentional, willful, dishonest or fraudulent conduct of another Insured or for the conduct of another Insured that constitutes a willful violation of any statute or regulation; or (b) Claim Expenses incurred until an allegation is adjudicated through a finding by a trier-of-fact to be intentional, willful, dishonest or fraudulent or a willful violation of any statute or regulation;

**7.** Based upon, arising out of, or in any way involving any:

    **a.** Actual, alleged or threatened discharge, disposal, migration, dispersal, release or escape of Pollutants; or

    **b.** Direction, order or request to test for, monitor, remediate, clean up, remove, contain, treat, detoxify or neutralize Pollutants, or to pay for or contribute to the costs of undertaking such actions;

**8.** Brought by or on behalf of any Employee, former Employee or prospective Employee based upon, arising out of, or in any way involving the employment relationship or the nature, terms or conditions of employment or any workplace tort;

Case 1:24-cv-09670-VSB    Document 5-2    Filed 12/19/24    Page 35 of 49

9. Brought by, in the name of, or on behalf of any past or current principal, partner, officer, director, trustee, shareholder, Employee, Volunteer Worker, manager or member of the Named Insured; provided, however, this exclusion shall not apply to any Claim arising out of Unauthorized Access or Potential Unauthorized Access to the personal information of any past or current principal, partner, officer, director, trustee, shareholder, Employee, Volunteer Worker, manger or member of the Named Insured which is in the care, custody or control of the Named Insured;

10. Based upon, arising out of, or in any way involving the insolvency, receivership, bankruptcy, liquidation of the Named Insured or of any subsidiary thereof whether or not included in the definition of Insured;

11. Based upon or arising out of any warranties or guarantees, express, implied or otherwise, or any cost estimates;

12. Based upon or arising out of any conversion, misappropriation, commingling of or defalcation of funds or property;

13. Based upon or arising out of any inability or failure of any party to pay or collect monies;

14. Based upon or arising out of infringement or inducement of infringement of patent or trade secret; or

15. Based upon, arising out of, or in any way involving an act, error or omission in the performance of professional services rendered or that should have been rendered by the Insured or by any person or organization for whose acts, errors or omissions the Insured is legally responsible.

B. With respect to DataBreach<sup>SM</sup> COVERAGE A. - Data Breach and Privacy Liability Coverage Part this Endorsement does not apply to any Claim:

1. Made by any person or organization which is operated, managed or owned, in whole or in part, by the Named Insured or any parent organization, subsidiary, division or affiliated organization thereof.

C. With respect to DataBreach<sup>SM</sup> COVERAGE B. - Data Breach Loss to Insured Coverage Part, this Endorsement does not apply to any Loss:

1. Caused by theft, physical damage or destruction of the Named Insured's Electronic Communications System or any part thereof; provided, however, this exclusion shall not apply to destruction of programs, electronic data and media caused by an Unauthorized Access;

2. Based upon or arising out of theft, or alleged theft, of money, securities, bonds, or similar financial instruments with monetary value caused or contributed to by any fraudulent, dishonest or criminal act committed by any person who is a past or current principal, partner, officer, director, trustee, shareholder, Employee, Volunteer Worker, manager or member of the Named Insured at the time of the Unauthorized Access, whether acting alone or in collusion with others; or

3. Of the value of trade secrets, confidential processing methods or other confidential or proprietary information.

5. Section TERRITORY is deleted and replaced with the following:

**TERRITORY**

The insurance afforded by this Endorsement applies worldwide, provided the Claim is made or the Loss is incurred in the United States of America, its territories or possessions or Puerto Rico.

6. Section LIMITS OF LIABILITY is deleted and replaced with the following:

**LIMITS OF LIABILITY**

A. **Limit of Liability - DataBreach<sup>SM</sup> COVERAGE A. - Data Breach and Privacy Liability Coverage Part - Each Claim:** The liability of the Company under DataBreach<sup>SM</sup> COVERAGE A. - Data Breach and Privacy Liability Coverage Part for the combined total of Damages, Regulatory Fines and Claim Expenses for each Claim first made against the Insured during the Policy Period or Extended Reporting Period, if exercised, and reported to the Company pursuant to Section CLAIMS, LOSS AND EXPENSES A., Claim Reporting Provision, shall not exceed the $50,000.

B. **Limit of Liability - DataBreach<sup>SM</sup> COVERAGE B. - Data Breach Loss to Insured Coverage Part - Each Unauthorized Access:** The liability of the Company under DataBreach<sup>SM</sup> COVERAGE B. - Data Breach Loss to Insured Coverage Part for all Loss resulting directly from each Unauthorized Access which occurs

Case 1:24-cv-09670-VSB    Document 5-2    Filed 12/19/24    Page 36 of 49

during the Policy Period and is reported to the Company pursuant to Section CLAIMS, LOSS AND EXPENSES B., Loss Reporting Provision, shall not exceed $5,000.

**C.    Limit of Liability – DataBreach<sup>SM</sup> COVERAGE C. - Breach Mitigation Expense Coverage Part - Each Unintentional Data Compromise:**  The liability of the Company under DataBreach<sup>SM</sup> COVERAGE C. - Breach Mitigation Expense Coverage Part for Breach Mitigation Expense for any Unintentional Data Compromise which occurs during the Policy Period and is reported to the Company pursuant to Section CLAIMS, LOSS AND EXPENSES C., shall not exceed $50,000.

**D.    Limit of Liability - Aggregate:**  Subject to the above Limits of Liability A., B. and C., the combined total liability of the Company for all coverage afforded by all Coverage Parts of this Endorsement shall not exceed $50,000.

**E.    Multiple Insureds, Claims, Losses and Claimants:**  The inclusion herein of more than one Insured in any Claim or the making of Claims by, or reporting of Loss incurred by, more than one person or organization shall not operate to increase the Limits of Liability stated in this Endorsement.

**1.**    With regard to DataBreach<sup>SM</sup> COVERAGE A. - Data Breach and Privacy Liability Coverage Part, more than one Claim arising out of a single Unauthorized Access or Interrelated Unauthorized Accesses shall be treated as a single Claim. Such single Claim shall be deemed first made on the date on which the earliest Claim arising out of such Unauthorized Access or Interrelated Unauthorized Accesses is made or with regard to notice given to and accepted by the Company pursuant to Section CLAIMS, LOSS AND EXPENSES D., Discovery Clause, on the date within the Policy Period on which such notice of potential Claim is first received by the Company.

**2.**    With regard to DataBreach<sup>SM</sup> COVERAGE B. - Data Breach Loss to Insured Coverage Part, more than one Loss arising out of a single Unauthorized Access shall be considered a single Unauthorized Access.

**3.**    With regard to DataBreach<sup>SM</sup> COVERAGE C. - Breach Mitigation Expense Coverage Part, all Breach Mitigation Expenses arising out of a single Unintentional Data Compromise or a series of related Unintentional Data Compromises, shall be treated as a single Unintentional Data Compromise.

**7.**    Section DEFENSE AND CLAIM EXPENSES is deleted and replaced with the following:

**DEFENSE AND CLAIM EXPENSES**

**A.    Defense and Investigation of Claims:**  With regard to DataBreach<sup>SM</sup> COVERAGE A. - Data Breach and Privacy Liability Coverage Part, the Company shall have the right and duty to defend the Insured and to investigate any Claim to which coverage afforded by this Endorsement under DataBreach<sup>SM</sup> COVERAGE A. - Data Breach and Privacy Liability Coverage Part applies pursuant to the following provisions:

**1.**    Claim Expenses incurred in defending and investigating such Claim shall be a part of and shall not be in addition to the applicable Limits of Liability stated in this Endorsement. Such Claim Expenses shall reduce the applicable Limits of Liability. The Company shall have no obligation to pay any Damages or to defend or continue to defend any Claim or to pay Claim Expenses after the applicable Limits of Liability have been exhausted by payment(s) of Damages and/or Claim Expenses.

**2.**    The Company shall select defense counsel; provided, however, that if the law of the state of the Named Insured's domicile, stated in the Declarations, allows the Insured to control the selection of defense counsel where a conflict of interest has arisen between the Insured and the Company, the Company will provide a list of attorneys or law firms from which the Insured may designate defense counsel who shall act solely in the interest of the Insured, and the Insured shall direct such defense counsel to cooperate with the Company. Such cooperation shall include:

**a.**    Providing on a regular basis, but not less frequently than every three (3) months, written reports on claimed Damages**,** potential liability, progress of any litigation, any settlement demands, or any investigation developments that materially affect the Claim;

**b.**    Providing any other reasonable information requested;

**c.**    Providing fully itemized billing on a periodic basis; and

**d.**    Cooperating with the Company and the Insured in resolving any discrepancies;

and the fees and costs incurred by such defense counsel, including those fees and costs generated by cooperation with the Company, as set forth above, shall be included in Claim Expenses. Such Claim Expenses shall be a part of and shall not be in addition to the applicable Limits of Liability stated in this Endorsement. Such Claim Expenses shall reduce the applicable Limits of Liability.

3. The determination of the Company as to the reasonableness of the Claim Expenses shall be conclusive on the Named Insured.

**B. Claim Settlement:** The Company may, at its sole discretion, investigate, negotiate and settle any Claim. The Named Insured will abide by the terms of such settlement.

**C. Loss or Breach Mitigation Expense Payment:** The Company may, at its sole discretion, investigate any Loss, any Breach Mitigation Expense, any Unintentional Data Compromise and any Unauthorized Access or Potential Unauthorized Access. The Company will indemnify the Named Insured within sixty (60) days after it receives the sworn proof of Loss under DataBreach$^{SM}$ COVERAGE B. - Data Breach Loss to Insured Coverage Part or satisfactory written proof of payment of Breach Mitigation Expenses under DataBreach$^{SM}$ COVERAGE C. - Breach Mitigation Expense Coverage Part, provided:

1. The Insured has complied with all the terms of this Endorsement; and

2. The Company and the Named Insured have agreed with the items included within and the amounts documented in the Named Insured's sworn proof of Loss and satisfactory written proof of payment of Breach Mitigation Expenses.

8. Section CLAIMS is deleted and replaced with the following:

**CLAIMS, LOSS AND EXPENSES**

**A. Claim Reporting Provision:** It is a condition precedent to coverage afforded by this Endorsement under DataBreach$^{SM}$ COVERAGE A. - Data Breach and Privacy Liability Coverage Part that the Insured shall give to the Company written notice as stated in the Notices item of the Declarations as soon as practicable of any Claim first made against the Insured during the Policy Period or the Extended Reporting Period, if exercised, and in no event later than sixty (60) days after the end of the Policy Period or the Extended Reporting Period, if exercised.

In the event a suit is brought against the Insured or a charge against the Insured is instituted by any Authority or any administrative action is initiated by an Authority, the Insured shall immediately forward to Markel Service, Incorporated, Ten Parkway North, Deerfield, Illinois, 60015, on behalf of the Company, every demand, notice, summons or other process received by him/her or by his/her representatives.

**B. Loss Reporting Provision:** It is a condition precedent to coverage afforded by this Endorsement under DataBreach$^{SM}$ COVERAGE B. - Data Breach Loss to Insured Coverage Part that the Named Insured shall give to the Company written notice as stated in the Notices item of the Declarations as soon as practicable and in no event later than sixty (60) days after the end of the Policy Period of any Loss which results directly from an Unauthorized Access which occurs during the Policy Period.

In the event of any Loss, the Insured must:

1. Notify law enforcement in the event of a theft;

2. Give the Company prompt notice of the Unauthorized Access;

3. As soon as practicable, provide a description of how, when and what elements of the Named Insured's Electronic Communications System were impacted by the Unauthorized Access;

4. Take all reasonable steps to protect the Named Insured's Electronic Communications System from further Unauthorized Access and to reduce Loss;

5. As often as may be reasonably required, permit the Company to inspect the Named Insured's Electronic Communications System and examine the Insured's books and records related to the Loss incurred; and

6. Provide, within sixty (60) days of the Company's request, a sworn proof of Loss, signed by the Named Insured, containing the information the Company requests to investigate the Loss.

Case 1:24-cv-09670-VSB    Document 5-2    Filed 12/19/24    Page 38 of 49

**C.** **Breach Mitigation Expense Reporting Provision:** It is a condition precedent to coverage afforded by this Endorsement under DataBreach$^{SM}$ COVERAGE C. - Breach Mitigation Expense Coverage Part that the Named Insured shall give to the Company written notice as stated in the Notices item of the Declarations as soon as practicable and in no event later than sixty (60) days after the end of the Policy Period of any Unintentional Data Compromise, Unauthorized Access or Potential Unauthorized Access which occurs during the Policy Period.

The Named Insured must:

1.   Submit to the Company satisfactory written proof of payment of such Breach Mitigation Expenses within one (1) year after the expiration or cancellation of this policy;

2.   As soon as practicable, provide a description of how, when and what elements, if any, of the Named Insured's or a third party's Electronic Communications System were impacted by the Unintentional Data Compromise, Unauthorized Access or Potential Unauthorized Access;

3.   Take all reasonable steps to protect the Named Insured's Electronic Communications System from further Unauthorized Access, if applicable;

4.   As often as may be reasonably required, permit the Company to inspect the Named Insured's Electronic Communications System and examine the Insured's books and records related to the Breach Mitigation Expense incurred.

**D.** **Discovery Clause:** Under DataBreach$^{SM}$ COVERAGE A. - Data Breach and Privacy Liability Coverage Part, if during the Policy Period, the Insured first becomes aware of a specific Unauthorized Access or specific Potential Unauthorized Access which is reasonably expected to result in a Claim within the scope of coverage of this DataBreach$^{SM}$ COVERAGE A. - Data Breach and Privacy Liability Coverage Part, then the Insured may provide written notice as stated in the Notices item of the Declarations to the Company containing the information listed below. If such written notice is received by the Company during the Policy Period, then any Claim subsequently made against the Insured arising out of such Unauthorized Access or Potential Unauthorized Access shall be deemed for the purpose of this insurance to have been first made on the date on which such written notice is first received by the Company.

It is a condition precedent to the coverage afforded by this Discovery Clause that written notice be given to the Company containing the following information:

1.   The description of the specific Unauthorized Access or Potential Unauthorized Access;

2.   The date on which such Unauthorized Access or Potential Unauthorized Access took place;

3.   The injury or damage which has or may result from such Unauthorized Access or Potential Unauthorized Access;

4.   The identity of any injured persons and/or organization subject to such injury or damage; and

5.   The circumstances by which the Insured first became aware of such Unauthorized Access or Potential Unauthorized Access.

Subject to the paragraph hereinabove, if during the Policy Period the Insured provides such written notice of a specific Unauthorized Access or Potential Unauthorized Access which is reasonably expected to result in a Claim within the scope of coverage of this DataBreach$^{SM}$ COVERAGE A. - Data Breach and Privacy Liability Coverage Part, the Company at its sole option, may investigate such specific Unauthorized Access or Potential Unauthorized Access. Such matter shall be subject to all terms, conditions and provisions in this Endorsement as applicable to a Claim.

**E.** **Assistance and Cooperation of the Insured:** The Insured shall cooperate with the Company and upon the Company's request, the Insured shall:

1.   Submit to examination and interview by a representative of the Company and while not in the presence of any other Insured, under oath if required;

2.   Attend hearings, depositions and trials;

3. Assist in effecting settlement, securing and giving evidence and obtaining the attendance of witnesses in the conduct of suits; and

4. Give a written statement or statements to the Company's representatives and meet with such representatives for the purpose of determining coverage and/or investigating any Claim or Loss and/or defending any Claim;

All without cost to the Company. The Insured shall further cooperate with the Company and do whatever is necessary to secure and effect any right of indemnity, contribution or apportionment which the Insured may have.

The Insured shall not, with respect to any Claim covered under this Endorsement, except at his/her own cost, make any payment, admit any liability, settle any Claims, assume any obligation, agree to arbitration or any similar means of resolution of any dispute, waive any rights or incur Claim Expenses without the Company's prior written consent, such consent not to be unreasonably withheld. Any costs and expenses incurred by the Insured prior to the Insured giving written notice of the Claim to the Company shall be borne by the Insured.

**F.    False or Fraudulent Claims:**  If any Insured shall commit fraud in proffering any Claim or Loss, this insurance shall become void as to such Insured from the date such fraudulent Claim or Loss is proffered.

9.    Section EXTENDED REPORTING PERIOD is deleted and replaced with the following:

**EXTENDED REPORTING PERIOD**

**A.**    With regard to DataBreach$^{SM}$ COVERAGE A. - Data Breach and Privacy Liability Coverage Part, the Named Insured's right to exercise the Extended Reporting Period under this Endorsement shall exist solely if the Named Insured also exercises its right to purchase the Extended Reporting Period under all Insuring Agreements in the policy for which an Extended Reporting Period is available.

**B.**  If the Named Insured nonrenews this policy or cancels this policy pursuant to Common Policy Conditions A., Cancellation, or if the Company nonrenews this policy or cancels this policy pursuant to Common Policy Conditions A., Cancellation, for reasons other than nonpayment of premium, Deductible and/or Co-Insurance Obligation or non-compliance with the terms and conditions of this policy, then the Named Insured shall have the right upon payment of an additional premium calculated at the percentage stated in the Declarations of the adjusted annual premium for the Policy Period, subject to adjustment as per Common Policy Conditions J., Premium and Audit, but in no event less than the percentage stated in the Declarations of the annual minimum premium for the policy, to extend the coverage granted under DataBreach$^{SM}$ COVERAGE A. - Data Breach and Privacy Liability Coverage Part for the period of months stated in the Declarations, as elected by the Named Insured, to apply to Claims first made against the Insured during the period of months as elected, and reported to the Company pursuant to Section CLAIMS, LOSS AND EXPENSES A., Claim Reporting Provision of this Endorsement, following immediately upon the effective date of such cancellation or nonrenewal, by reason of any Unauthorized Access or Potential Unauthorized Access the entirety of which happened during the Policy Period or on or after the Retroactive Date stated in Section INSURING AGREEMENT, DataBreach$^{SM}$ COVERAGE A. - Data Breach and Privacy Liability Coverage Part, Item 1., and prior to the effective date of such cancellation or nonrenewal and which is otherwise covered by this Endorsement. This extended period of coverage as elected by the Named Insured and described in this paragraph shall be referred to in this policy as the Extended Reporting Period.

If, however, this policy is immediately succeeded by similar claims made insurance coverage on which the applicable Retroactive Date is the same as or earlier than that stated above, the succeeding insurance shall be deemed to be a renewal hereof and, in consequence, the Named Insured shall have no right to purchase an Extended Reporting Period.

The quotation of a different premium and/or Deductible and/or Co-Insurance Obligation and/or Limit of Liability for renewal does not constitute a cancellation or refusal to renew for the purpose of this provision.

**C.**    As a condition precedent to the right to purchase the Extended Reporting Period, the Named Insured must have paid:

1.    All Deductibles when due;

2.    All Co-Insurance Obligations when due;

3. All premiums due for the Policy Period; and

4. All premium, deductibles and co-insurance obligations due on any other policy(ies) issued by the Company or any of its affiliated companies in an uninterrupted series of policies of which this policy is a renewal or replacement.

The right to purchase the Extended Reporting Period shall terminate unless a written notice as stated in the Notices item of the Declarations of such election for the Extended Reporting Period is received by the Company within thirty (30) days after the effective date of cancellation or nonrenewal together with payment of the additional deposit premium for the Extended Reporting Period. If such written notice of request and payment of additional premium for the Extended Reporting Period are not so received by the Company, there shall be no right to purchase the Extended Reporting Period at a later date.

**D.** The Named Insured shall pay any additional premium that may be due as a result of audit, promptly when due.

**E.** In the event of the purchase of the Extended Reporting Period the entire premium therefor shall be fully earned at its commencement.

**F.** The Extended Reporting Period shall not in any way increase the Limits of Liability stated in this policy or in this Endorsement.

10. Section OTHER CONDITIONS is amended by the addition of the following:

**Mitigation:** It is a condition precedent to coverage that the Insured shall not willfully fail to comply with any Security Breach Notice Law that the Named Insured may be subject to, by reason of an Unauthorized Access or Potential Unauthorized Access.

11. The following Conditions and provisions of the policy shall also apply to the coverage afforded by this Endorsement.

Cancellation,
Representations,
Entire Agreement,
Other Insurance,
Changes,
Assignment of Interest,
Subrogation,
Assistance and Cooperation of the Insured,
False and Fraudulent Claims,
Premium and Audit,
Inspection
Action Against the Company,
Authorization, and
Service of Suit.

All other terms and conditions remain unchanged.

**MESM 2034 08 15**                                                    **Page 12 of 12**

POLICY NUMBER: SM937777



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

## RISK MANAGEMENT SERVICES
## EXPENSE REIMBURSEMENT COVERAGE

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

**1.** The policy is amended by the addition of the following:

**Risk Management Services Expense Reimbursement Limit: $400**

**2.** Section SUPPLEMENTARY PAYMENTS, Risk Management Services Expense Reimbursement, is added as follows:

**SUPPLEMENTARY PAYMENTS**

**Risk Management Services Expense Reimbursement: In the event that:**

**a.** During the Policy Period, the Named Insured incurs Risk Management Services Expense with the prior written approval of the Company; and

**b.** During the Policy Period or within six (6) months following the expiration or earlier cancellation or termination of this policy, the Named Insured submits a request for reimbursement of such Risk Management Services Expense by providing an itemized accounting of such Risk Management Services Expense, which is submitted in writing to the Company by completion of the Company's Risk Management Service Expense Reimbursement Form which must be submitted to the Company addressed to Medical Professional Team, Markel Service Incorporated, 10 Parkway North, Deerfield, IL 60015 (Fax: (847) 572-6377);

The Company will reimburse the Named Insured for such Risk Management Services Expense up to the Risk Management Services Expense Reimbursement Limit set forth in Item 1. of this endorsement.

Reimbursement to the Named Insured pursuant to this provision shall be in addition to the Limits of Liability stated in the Declarations and shall not be subject to the Deductible.

**3.** Section DEFINITIONS is amended by the addition of the following:

**Risk Management Services Expense** means expense incurred with the prior written approval of the Company for risk management seminars, publications, risk management training, onsite risk consulting and training, risk management audit services or other risk management related services provided by a Risk Management Services Firm and related to the risks of professional and/or general liability, data privacy and security. However, Risk Management Services Expense shall not include:

**1.** Compensation, fees, benefits, overhead, charges or expense of any person or organization included in the definition of Insured;

**2.** Any expenses that are payable on the Named Insured's behalf or reimbursable to the Named Insured under any other insurance, whether collectible or not;

**3.** Any amounts related to any existing or anticipated claim or suit, including but not limited to legal fees, fees of a public adjuster or appraiser, court costs, and expert witness fees;

**4.** Meal and beverages expenses, and travel expenses including but not limited to airfare, transportation, and lodging.

**Risk Management Services Firm** means any service provider requested by the Named Insured and approved by the Company to provide risk management services. The Company's approval shall not be unreasonably withheld.

All other terms and conditions remain unchanged.

**MESM 2055 02 13**

**Page 1 of 1**

POLICY NUMBER: SM937777



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SEXUAL ACTS LIABILITY ENDORSEMENT

This endorsement modifies insurance provided under the following but only if such Coverage Part is purchased and attached to this policy:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART - CLAIMS MADE COVERAGE

SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY INSURANCE COVERAGE PART - CLAIMS MADE COVERAGE

SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY INSURANCE COVERAGE PART – OCCURRENCE COVERAGE

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

I.    Specified Medical Professions Professional Liability Insurance Coverage Part is amended as follows:

Section INSURING AGREEMENT is amended by the addition of the following:

1.    **Sexual Acts Liability:** The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount stated in the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of a Claim first made against the Insured during the Policy Period or during the Extended Reporting Period, if exercised, and reported to the Company pursuant to Section CLAIMS A., Claim Reporting Provision, for Sexual Injury arising out of any Sexual Act perpetrated or alleged to have been perpetrated by the Insured natural person or by any person for whose actions the Insured is legally responsible, or for allegations that the Insured was negligent in hiring, training or supervising any Insured natural person who perpetrated or is alleged to have perpetrated a Sexual Act resulting in Sexual Injury provided:

1.    Such Sexual Act is perpetrated or alleged to have been perpetrated during the Policy Period or on or after the Retroactive Date stated in the Declarations and before the end of the Policy Period; and

2.    Prior to the effective date of this policy the Insured had no knowledge of such Sexual Act or any fact, circumstance, situation or incident involving such Sexual Act which may lead a reasonable person in the Insured's position to conclude that a Claim was likely.

2.    Section DEFINITIONS is amended by the addition of the following:

**Sexual Act** means sexual abuse, sexual molestation or sexual exploitation arising out of the conduct of the Insured's Professional Services.

**Sexual Injury** means bodily injury, sickness, disease, unlawful detention, false imprisonment, humiliation, emotional distress, mental anguish, sexual dysfunction, invasion of right of privacy, assault or battery, solely when arising out of a Sexual Act.

3.    Section THE EXCLUSIONS L. is deleted.

4.    Section THE EXCLUSIONS is amended by the addition of the following exclusions:

(i)    Any Insured who perpetrates or is alleged to have perpetrated a Sexual Act resulting in Sexual Injury; provided, however, the Company shall defend such Insured and pay Claim Expenses on their behalf unless it is established in fact that such Insured perpetrated such Sexual Act;

(ii)    Any manager, supervisor, partner, officer, director or trustee who gains knowledge of any actual or alleged Sexual Act and fails to take reasonable care to prevent a future Sexual Act;

**MESM 2057 08 15**                                                                                           **Page 1 of 2**

Case 1:24-cv-09670-VSB    Document 5-2    Filed 12/19/24    Page 43 of 49

    **(iii)** Any Claim based upon or arising out of any Sexual Act which is perpetrated or alleged to have been perpetrated by an Insured who previously perpetrated or is alleged to have previously perpetrated a Sexual Act, and after a manager, supervisor, partner, officer, director or trustee has gained knowledge of the previously perpetrated or previously alleged to have been perpetrated Sexual Act; or

    **(iv)** Any Claim based upon or arising out of Sexual Injury to any Employee of the Insured.

**5.** Section LIMITS OF LIABILITY is amended by the addition of the following:

    **F.** **Limit of Liability - Sexual Acts Liability Coverage**: The total liability of the Company for the combined total of Damages and Claim Expenses for all Claims under Sexual Liability Coverage insured herein is limited to:

        **1.** $1,000,000  All Claims Made by Each Claimant

        **2.** $1,000,000  All Claims under Sexual Acts Liability Coverage

    **G.** **Multiple Sexual Acts:** Two or more Sexual Acts against one person shall be deemed to be one Sexual Act and shall be subject to the coverage and limits in effect at the time of the first Sexual Act.

**6.** Section LIMITS OF LIABILITY B. is amended by the addition of the following:

Subject to Section LIMITS OF LIABILITY F., Limits of Liability - Sexual Acts Liability Coverage, the total liability of the Company under this endorsement for all Damages and Claim Expenses for all Claims insured herein because of Sexual Injury or allegations that the Insured was negligent in hiring, training or supervising any Insured natural person who perpetrated or is alleged to have perpetrated a Sexual Act resulting in Sexual Injury shall be part of and not in addition to the Specified Medical Professions Professional Liability Insurance Coverage Part Aggregate Limit of Liability stated in the Declarations, arising out of all Claims first made against the Insured during the Policy Period and the Extend Reporting Period, if exercised.

**II.** Specified Medical Professions General Liability Insurance Coverage Part is amended as follows:

**1.** Section DEFINITIONS is amended by the addition of the following:

**Sexual Act** means sexual abuse, sexual molestation or sexual exploitation arising out of the conduct of the Insured's Professional Services.

**Sexual Injury** means bodily injury, sickness, disease, unlawful detention, false imprisonment, humiliation, emotional distress, mental anguish, sexual dysfunction, invasion of right of privacy, assault or battery, solely when arising out of a Sexual Act.

**2.** Section THE EXCLUSIONS A. is amended by the addition of the following exclusions:

    **(i)** Based upon or arising out of any Sexual Injury; or

    **(ii)** Based upon or arising out of any allegations that the Insured was negligent in hiring, training or supervising any person who perpetrated or is alleged to have perpetrated a Sexual Act resulting in Sexual Injury.

All other terms and conditions remain unchanged.

**MESM 2057 08 15**



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT (HIPAA) – CIVIL MONETARY PENALTY ENDORSEMENT

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE PART –- CLAIMS MADE COVERAGE
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART — CLAIMS MADE COVERAGE

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

1.  The policy is amended by the addition of the following:

    **SUPPLEMENTARY PAYMENTS**

    A.  **HIPAA Civil Monetary Penalty Coverage:** The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount stated in the Declarations, which the Insured shall become legally obligated to pay as a Civil Monetary Penalty as a result of a HIPAA Civil Violation first made against the Insured during the Policy Period or during the Extended Reporting Period, if exercised, arising out of any HIPAA Civil Violation committed or alleged to have been committed by the Insured or by any person for whose actions the Insured is legally responsible provided:

        1.  such HIPAA Civil Violation:

            a.  arises out of the conduct of the Insured's Professional Services; and

            b.  is committed or alleged to have been committed during the Policy Period or on or after the Retroactive Date as stated in the Declarations; and

        2.  prior to the effective date of this policy the Insured had no knowledge of such HIPAA Civil Violation or any fact, circumstance, situation or incident which may result in a HIPAA Civil Violation.

        **Limits of Liability - HIPAA Civil Monetary Penalty**: The total liability of the Company for the combined total of Civil Monetary Penalties and Legal Expenses for each HIPAA Civil Violation first made during the Policy Period or the Extended Reporting Period, if exercised, shall not exceed the Limit of Liability stated below as applicable to Each HIPAA Civil Violation. Subject to the foregoing, the total liability of the Company for the combined total of Civil Monetary Penalties and Legal Expenses for all HIPAA Civil Violations first made during the Policy Period or the Extended Reporting Period, if exercised, shall not exceed the Limit of Liability stated below as applicable to All HIPAA Civil Violations.

        1.  $250,000    Each HIPAA Civil Violation

        2.  $250,000    All HIPAA Civil Violations

        The Insured shall give the Company written notice as stated in the Declarations within ten (10) days of the Insured receiving a notice of HIPAA Civil Violation and in any event such written notice shall be provided prior to the Insured incurring any legal fees or legal expenses related to such matter.

        The Company shall have the right and duty to defend and investigate any HIPAA Civil Violation to which coverage under this Coverage Part applies. The Company may make such investigation and settlement of any HIPAA Civil Violation as it deems expedient. Legal Expenses incurred in defending and investigating a HIPAA Civil Violation shall be a part of and shall not be in addition to the Limits of Liability stated in Section Supplementary Payments, HIPAA Civil Monetary Penalty Coverage. Such Legal Expenses shall reduce the Limits of Liability stated in Section Supplementary Payments, HIPAA Civil Monetary Penalty Coverage and shall be applied against the

Deductible. The Company shall have no obligation to pay any Civil Monetary Penalty or to defend or to continue to defend any HIPAA Civil Violation or to pay Legal Expenses for HIPAA Civil Violations after the Limits of Liability stated in Section Supplementary Payments, HIPAA Civil Monetary Penalty Coverage have been exhausted.

Payments pursuant to this Section shall be in addition to the Limits of Liability stated in the Declarations.

2. Section Definitions is amended by the addition of the following:

**Civil Monetary Penalty** means a civil monetary penalty imposed by the Secretary of the United States Department of Health and Human Services, or his or her designee, under 42 U.S.C. §1320d-5 and 45 C.F.R. §160.404.

**Health Insurance Portability and Accountability Act ("HIPAA")** means the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191.

**HIPAA Civil Violation** means a notice received by the Insured for failure to comply with the HIPAA Standards for Privacy of Individually Identified Health Information (Privacy Rule) which protects the privacy of individual health information, including maintaining the confidentiality of information regarding medical services and limiting the release or use of such information in conformance with state or federal law, including any allegation that the Insured was negligent in hiring, training or supervising any Insured person who failed or is alleged to have failed to comply with the Privacy Rule.

**Legal Expenses** means reasonable and necessary amounts incurred by the Company or by the Insured with the prior written consent of the Company in the defense of that portion of any HIPAA Civil Violation for which coverage is afforded under this Coverage Part, including costs of investigation and costs of appeals; provided, however, Legal Expenses shall not include: (1) salary, wages, overhead, or benefit expenses of or associated with Employees or officials of the Named Insured or employees or officials of the Company; or (2) salary, wages, administration, overhead, benefit expenses, or charges of any kind attributable to any in-house counsel or captive out-of-house counsel for the Named Insured or the Company.

3. Section The Exclusions is amended by the addition of the following exclusions:

With respect to Supplementary Payments, HIPAA Civil Monetary Penalty Coverage, such coverage does not apply to any HIPAA Civil Violation:

1. based upon, arising out of, or in any way involving:

   a. any HIPAA Civil Violation or any claim, fact, circumstance, situation or incident which has or may result in a HIPAA Civil Violation that has been the subject of any notice given prior to the Policy Period under any other policy of insurance; or

   b. any HIPAA Civil Violation, whenever occurring, which is logically or causally connected to another HIPAA Civil Violation by reason of any common fact, circumstance, situation, event or transaction that has been the subject of any notice given prior to the Policy Period under any other policy of insurance; or

2. based upon, arising out of, or in any way involving any litigation, demand, investigation, administrative or regulatory proceeding or other proceeding pending, or order, decree or judgment entered, against any Insured on or prior to the inception date of this policy, or the same or any substantially similar HIPAA Civil Violation or any fact, circumstance, situation or incident underlying or alleged therein.

4. Section Limits of Liability is amended by the addition of the following:

**Multiple Insureds, HIPAA Civil Violations and Protected Health Information Records Released:** The inclusion herein of more than one Insured in any HIPAA Civil Violation shall not operate to increase the Limits of Liability stated in Section Supplementary Payments, HIPAA Civil Monetary Penalty Coverage. More than one HIPAA Civil Violation arising out of a single release of protected health information or a series of related releases of protected health information shall be considered a single HIPAA Civil Violation. All such HIPAA Civil Violations, whenever made, shall be treated as a single HIPAA Civil Violation. Such single HIPAA Civil Violation, whenever made, shall be deemed to be first made on the date on which the earliest HIPAA Civil Violation arising out of such release of protected health information is made.

All other terms and conditions remain unchanged.

Case 1:24-cv-09670-VSB    Document 5-2    Filed 12/19/24    Page 46 of 49



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CRISIS MANAGEMENT EMERGENCY RESPONSE
## EXPENSE REIMBURSEMENT COVERAGE

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART
LOCUM TENENS AND CONTRACT STAFFING PROFESSIONAL LIABILITY INSURANCE COVERAGE PART

In consideration of the premium paid, it is understood and agreed that the policy is amended as follows:

1.  The policy is amended by the addition of the following:

    **Crisis Management Emergency Response Expense Reimbursement Limit:**   $25,000

2.  Section SUPPLEMENTARY PAYMENTS, Crisis Management Emergency Response Expense Reimbursement, is added as follows:

    **SUPPLEMENTARY PAYMENTS**

    **Crisis Management Emergency Response Expense Reimbursement:**  In the event that:

    a.  during the Policy Period, the Named Insured incurs Crisis Management Emergency Response Expenses with the prior written approval of the Company; and

    b.  during the Policy Period or within six (6) months following the date the Crisis was initiated, the Named Insured submits a request for reimbursement of such Crisis Management Emergency Response Expenses by providing an itemized accounting of such Crisis Management Emergency Response Expenses, which is submitted in writing to the Company by completion of the Company's Crisis Management Emergency Response Expense Reimbursement Form which must be submitted to the Company addressed to Medical Professional Team, Markel Service Incorporated, 10 Parkway North, Deerfield, IL 60015 (Fax: (847) 572-6377);

    the Company will reimburse the Named Insured for such Crisis Management Emergency Response Expenses up to the Crisis Management Emergency Response Expense Reimbursement Limit set forth in Item 1. of this endorsement.

    Reimbursement to the Named Insured pursuant to this provision shall be in addition to the Limits of Liability stated in the Declarations and shall not be subject to the Deductible.

3.  Section DEFINITIONS is amended by the addition of the following:

    **Crisis** means the public announcement that an Incident occurred on the Named Insured's premises or at an event sponsored by the Named Insured.

    **Crisis Management Emergency Response Expenses** mean those expense incurred by the Named Insured for services provided by a Crisis Management Firm. However, Crisis Management Emergency Response Expenses shall not include:

    1.  Compensation, fees, benefits, overhead, charges or expense of any person or organization included in the definition of Insured;

    2.  Any expenses that are payable on the Named Insured's behalf or reimbursable to the Named Insured under any other insurance, whether collectible or not;

**MESM 2093 01 14**                                                              **Page 1 of 2**

**3.** Claim adjustment costs incurred by the Named Insured, such as fees incurred by retaining a public adjuster or appraiser.

**Crisis Management Firm** means any service provider requested by the Named Insured and approved by the Company to provide Crisis management emergency response services. The Company's approval shall not be unreasonably withheld.

**Incident** means an accident or other event, including the accidental discharge of pollutants, resulting in death or Serious Bodily Injury to three (3) or more persons.

**Serious Bodily Injury** means any injury to a person that creates a substantial risk of death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

All other terms and conditions remain unchanged.

**MESM 2093 01 14**

FILED: NEW YORK COUNTY CLERK 12/02/2024 10:57 AM INDEX NO. 161011/2024
NYSCEF DOC. NO. 2                                              RECEIVED NYSCEF: 12/02/2024



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CHANGES – MULTIPLE INSUREDS, CLAIMS AND CLAIMANTS

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART

In consideration of the premium paid, it is hereby understood and agreed that this policy is amended as follows:

Paragraph **E.** Multiple Insureds, Claims and Claimants in Section Limits Of Liability is replaced by the following:

**E. Multiple Insureds, Claims and Claimants:** The inclusion herein of more than one Insured in any Claim or the making of Claims by more than one person or organization shall not operate to increase the Limits of Liability stated in the Declarations. More than one Claim arising out of a single act, error or omission or a series of related acts, errors or omissions shall be considered a single Claim. All such Claims, whenever made, shall be deemed to be first made on the date on which the earliest Claim arising out of such act, error or omission or series of related acts, errors or omissions are made, or with regard to written notice given to and accepted by the Company pursuant to Section CLAIMS B., Discovery Clause, on the date within the Policy Period on which such written notice of potential Claim is first received by the Company. The only limits of liability applicable to the Claim are the limits of liability in force for the Policy Period during which the initial Claim was first made.

All other terms and conditions remain unchanged.

**MESM 2147 05 20**                                                                                 **Page 1 of 1**



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## TRADE OR ECONOMIC SANCTIONS

The following is added to this policy:

**Trade Or Economic Sanctions**

This insurance does not provide any coverage, and we (the Company) shall not make payment of any claim or provide any benefit hereunder, to the extent that the provision of such coverage, payment of such claim or provision of such benefit would expose us (the Company) to a violation of any applicable trade or economic sanctions, laws or regulations, including but not limited to, those administered and enforced by the United States Treasury Department's Office of Foreign Assets Control (OFAC).

All other terms and conditions remain unchanged.

MIL 1214 09 17

Page 1 of 1